869 A.2d 751

Charles D. McDERMOTT

v.

Hugh J. DOUGHERTY, Sr., et al.

No. 58, Sept. Term, 2004.

Court of Appeals of Maryland.

March 10, 2005.

322

Laura D. Matney (Matney Law Firm, LLC, on the brief), Rockville, for petitioner.

J. David Ash, Towson, for respondents.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

CATHELL, J.

This appeal arises as an outgrowth of the lengthy and unfortunately acrimonious dispute over custody of Patrick Michael McDermott (hereinafter "Patrick" or "the child"), the minor son of petitioner Charles David McDermott (hereinafter

"Mr. McDermott"), between Mr. McDermott and respondents, Hugh and Marjorie Dougherty, the child's maternal grandparents, (hereinafter "the Doughertys," or "maternal grandparents").[1]

The Doughertys, along with Patrick's paternal grandparents, who do not appear as parties to the instant appeal and do not now appear to support the Doughertys, filed a complaint in the Circuit Court for Harford County against their adult children, Mr. McDermott and Ms. Dougherty, for Third–Party Custody of Patrick on February 12, 2002. Trial on the matter of custody subsequently took place on July 1 and 2, 2003. The circuit court issued its decision on September 8, 2003, awarding the maternal grandparents sole legal and physical custody of the child based upon that court's finding that Ms. Dougherty was "unfit," and, *although not finding Mr. McDermott an "unfit"* parent, the court found that his employment in the merchant marine, requiring him to spend months-long intervals at sea, constituted "exceptional circumstances" as that term was defined in *Ross v. Hoffman,* 280 Md. 172, 191, 372 A.2d 582, 593 (1977) (*"Hoffman"*), and the "best interest of the child" and need for a stable living situation thus warranted that custody be placed with the Doughertys. Mr. McDermott appealed this decision to the Court of Special Appeals, which affirmed the lower court's decision in an unreported April 5, 2004, opinion. The intermediate appellate court subsequently denied Mr. McDermott's Motion for Reconsideration on May 21, 2004, and thereafter he petitioned this Court for a Writ of Certiorari, which we granted on August 25, 2004. *McDermott v. Dougherty,* 382 Md. 688, 856 A.2d 724 (2004).[2]

Petitioner's appeal centers on the following questions:

---

1. There has also been litigation between petitioner and Laura A. Dougherty (hereinafter "Ms. Dougherty"), the child's natural mother and petitioner's former wife. The conflicts between them are not at issue in the present case.

2. The present case stems from a subsequent complaint filed in the original case initiated by Mr. McDermott's Complaint for Limited Divorce, Child Custody and Child Support, filed in the Circuit Court for

"1. Is concern that the parent might not obtain employment and remain in the state of Maryland a high enough concern to meet the 'only to prevent harm or potential harm to the child' standard required by the U.S. Supreme Court case of *Troxel v. Granville* and/or the high standards referenced in the previous cases cited therein, 530 U.S. 57[, 120 S.Ct. 2054, 147 L.Ed.2d 49] (2000)?

2. Do the facts involved in this case constitute 'exceptional circumstances' as described in *Shurupoff v. Vockroth,* 372 Md. 639[, 814 A.2d 543] (2003)?

3. Does the Order in this case violate the holding of the Maryland case of *Schaefer v. Cusack,* 124 Md.App. 288[, 722 A.2d 73] (1998), which is that custody must be decided based on the circumstances as they are now and not based on a future plan or conjecture or based on past behavior that has ceased?" [Alterations added.]

We hold that in disputed custody cases where private third parties are attempting to gain custody of children from their natural parents, the trial court must first find that both natural parents are unfit to have custody of their children or that extraordinary circumstances exist which are significantly detrimental to the child remaining in the custody of the parent or parents, before a trial court should consider the "best interests of the child" standard as a means of deciding the dispute.

We further hold that under circumstances in which there is no finding of parental unfitness, the requirements of a parent's employment, such that he is required to be away at sea, or otherwise appropriately absent from the State for a period of time, and for which time he or she made appropriate arrange-

---

Harford County on September 29, 1995, seeking a divorce from Laura A. Dougherty, and captioned, *Charles McDermott v. Laura McDermott.* While the maternal and the paternal grandparents were not parties to the parents' divorce, both the divorce case and the present case have the same origin and bear the same case number, albeit the case *sub judice* has been recaptioned.

ments for the care of the child, do not constitute "extraordinary or exceptional circumstances" to support the awarding of custody to a third party.

Accordingly, we shall reverse and direct the lower courts to grant custody of Patrick to petitioner. Although we find the declaration, announced by the plurality opinion in *Troxel*,[3] affirming "the fundamental right of parents to make decisions concerning the care, custody, and control of their children," 530 U.S. 57, 66, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000), to be instructive, our determination also rests upon the potential for absurd results that might result from a holding that denies custody to a fit and willing parent on the basis that the means by which he or she supports himself or herself and his or her family calls for his or her periodic absence from the State although having arranged suitable and safe alternative care for the child, or based upon the fact that the child, in a particular case, might be "better raised" by grandparents. With our holding we need not reach the issue of whether the circuit court's order in the case *sub judice* improperly examined past behavior or future plans in deciding custody.

## I. Facts

By the time of the current dispute there had been a lengthy series of events in the dispute over the custody of Patrick Michael McDermott, born April 30, 1995, to Charles David McDermott and Laura A. Dougherty, who were married on November 26, 1994, in Baltimore County and subsequently took up residence in Abingdon, Maryland. Their relationship having deteriorated, the spouses separated shortly after Patrick's birth. Suffice it to say, between the time this custody disagreement was launched by Mr. McDermott's September 29, 1995 filing, in the Circuit Court for Harford County, of his Complaint for Limited Divorce, Child Custody and Child Support from Ms. Dougherty, and the grandparents' February

---

**3.** Justice O'Connor wrote the opinion for the Court in *Troxel* in which three members of the Court joined. Justices Souter and Thomas wrote concurring opinions. Justices Stevens, Scalia and Kennedy wrote dissenting opinions.

2002 complaint for third-party custody, *i.e.*, the action to which the instant appeal can be most directly traced, the various parties, whether represented by counsel or proceeding pro se, utilized the full measure of the court's resources in their filings of petitions and motions in regard to support and custody of Patrick.

Ms. Dougherty, who had some history of alcohol-related trouble, was convicted of her fourth drinking and driving offense in November 2001, which ultimately would result in a period of incarceration. On January 3, 2002, apparently just prior to her incarceration, Ms. Dougherty, who then had primary residential custody of Patrick, signed a power of attorney giving her parents, the Doughertys, authority to care for Patrick and make all decisions on his behalf. Apparently unaware of Ms. Dougherty's incarceration, Mr. McDermott filed a motion on January 8, 2002, seeking a temporary modification of a November 8, 2001, custody order and stated in his reasons for the petition, the following:

"The mother has left town, given power of attorney to parents and quit her job. Ms. Dougherty is scheduled for sentencing on 3/15/02 for up to 24 months. I am unemployed currently."

He requested that custody be shared by himself and the maternal grandparents. Sometime prior to January 10, 2002, and possibly as early as early December 2001, petitioner signed on to work a six-month seaman's contract at sea. Mr. McDermott executed a notarized letter on January 9, 2002, stating his desire that Patrick remain in the care and custody of the Doughertys at their home in Joppa, Maryland, through the end of the 2001–2002 academic year. In addition, Mr. McDermott wrote a letter, which appears to be dated January 10, 2002, to Patrick's court-appointed attorney and indicated that Mr. Dougherty, Patrick's grandfather, had responded that he and his wife did not know Ms. Dougherty's whereabouts when queried by Mr. McDermott.[4]

---

4. This was not true. At trial Mr. Dougherty testified that his silence as to Ms. Dougherty's being in jail was at the advice of counsel.

Apparently, after Mr. McDermott went to sea, the court signed an order to show cause in response to his Temporary Motion/Petition to Modify Custody and scheduled the matter for a show-cause hearing on January 14, 2002, requiring that the child's mother as well as the Doughertys be present.

Mr. McDermott departed on his ship in the first half of January 2002. While it is not manifest that any subterfuge occurred, it seems that petitioner went to sea believing that Ms. Dougherty still had legal custody of the child and not knowing of her incarceration or of the scheduled hearing on his petition.

At some point in time, what formerly had been a cooperative relationship between Mr. McDermott and the Doughertys deteriorated. The Doughertys' counsel apparently spoke with Mr. McDermott by telephone on January 14, 2002, while the latter was aboard ship, and informed him that Ms. Dougherty had begun a jail sentence on or about January 4, 2002. In affirming this conversation as well as Mr. McDermott's apparent consent that both sets of grandparents share joint legal custody of Patrick, the Doughertys' counsel prepared and filed in the Circuit Court for Harford County on February 12, 2002, a Complaint for Third–Party Custody and Motion for an Ex-parte Order, naming the Doughertys, as well as the McDermotts, Patrick's paternal grandparents, as plaintiffs.[5] The paternal grandparents later noted, however, that they "never signed a document to be plaintiffs in this case, and have had a strained relationship with the Dougherty's [sic] during the period January to July 2002" when Mr. McDermott was at sea.

On February 13, 2002, the court signed an order providing that the grandparents, the Doughertys and the McDermotts, would share "temporary joint legal custody" and the Doughertys would have residential custody of Patrick. Visitation by the parents—one of whom was in jail, and the other at sea at

---

5. It is not clear from the record whether the Doughertys' counsel knew that petitioner was at sea.

the time—was ordered to "take place at the mutual convenience and approval of plaintiffs," *i.e.*, the Doughertys.[6]

Mr. McDermott returned from sea in early July 2002 and the Doughertys, without any modification of the court's custody order, apparently returned Patrick to Mr. McDermott shortly thereafter to mollify the child's sustained entreaties and crying that he wanted to be with his father. Patrick remained with his father for the duration of 2002. On July 25, 2002, petitioner filed a Complaint for Modification of Custody seeking to be granted permanent primary residential and legal custody of Patrick. The Doughertys, labeling Patrick's living with his father at the time as "de facto" custody, sought to dismiss the complaint stating that they were "unsure as to Mr. McDermott's ability to care for the child on a daily basis and believe that it is in the best interest of the child that custody not be changed . . . ." Petitioner's parents, who at the time shared legal custody with the Doughertys, agreed with petitioner's request for a change of legal custody to him.

At a pre-trial conference in November 2002, the matter was set down for trial in May 2003 but trial was later delayed until July 2003. The circuit court advised Mr. McDermott to hire an attorney to represent him in his petition for custody, and accordingly, Mr. McDermott hired his present attorney in December 2002 and went to sea in early 2003 in order to "make the money to pay for [a custody] attorney" (alteration added). Apparently, Patrick lived with the Doughertys during his father's time at sea in the early months of 2003. Mr. McDermott returned to Maryland in March 2003 during his two-week break between ship assignments.

Ms. Dougherty, petitioner's former wife, filed a Motion to Modify Custody on May 23, 2003, seeking to remove Patrick from her parents' custody,[7] citing that they withheld visitation,

---

**6.** While at sea, Mr. McDermott did manage to see his son when he flew Patrick and the child's paternal grandparents to Texas in late April 2002 to spend a week aboard ship to celebrate Patrick's birthday.

**7.** Her parents filed an opposition to the motion and sought to retain custody of Patrick.

were "verbally and psychologically abusive to the child" and "[b]oth of the child's natural parents are able and willing to take care of Patrick." On June 18, 2003, Mr. McDermott responded in opposition to his former wife's motion. He filed an answer, an amended complaint for custody and also apparently sought back child support from Ms. Dougherty as well as trial costs and an estimated $18,000 in legal fees that he expected to incur at the scheduled trial. The circuit court did not immediately rule on these and other outstanding motions.

Trial in the matter of Mr. McDermott's request for permanent custody took place on July 1 and 2, 2003. The parties presented both lay and expert testimony regarding Ms. Dougherty's and Mr. McDermott's respective fitness as parents. Mr. McDermott indicated that he went to sea in January 2003 in order to bolster his finances in his effort to obtain sole custody of Patrick and he intended to establish permanent residence in Maryland if granted full custody. He noted that he and Patrick were then residing with a family in Port Deposit, an atypical, though presently workable and harmonious, living situation.

The maternal grandparents stated that they had decided to contest custody because they believed that Patrick needed stability in his life and over the past four years they had been the only consistently stable presence for the child. Upon the trial's conclusion, the circuit court held the matter *sub curia,* and stated that the current order, *i.e.,* that of February 13, 2002, remained in effect. The parties continued to jostle for custody while the ruling remained pending in the circuit court.

The circuit court issued a memorandum opinion and order on September 8, 2003, granting sole legal and physical custody of Patrick to the Doughertys. The court expressed its doubt at the veracity of Mr. McDermott's stated intentions to remain in Maryland and stated in its finding:

"Based on the analysis of the above [*Ross v. Hoffman,* 280 Md. at 191, 372 A.2d at 593] factors, the court concludes that Ms. Dougherty is unfit to have custody at this time, and that exceptional circumstances exist that overcome the pre-

sumption that Patrick's best interest is served by custody in Mr. McDermott. In particular, because the court is unable to rely upon Mr. McDermott's representations that he intends to obtain employment and remain in Maryland, it would appear, to Patrick's detriment, that stability in his living arrangements would be jeopardized." [Alteration added.]

On September 16, 2003, Mr. McDermott, through his counsel, filed simultaneously a Motion to Alter or Amend Judgment contending that the circuit court's opinion was contrary to existing federal and state case law and a notice of appeal to the Court of Special Appeals. The circuit court denied petitioner's motion. The Court of Special Appeals affirmed the trial court's decision on April 5, 2004, with an unreported decision that incorporated the circuit court's detailed recitation of the considerable procedural history of this case. Petitioner sought reconsideration from the intermediate appellate court, but was denied on May 21, 2004.

## II. Discussion

### A. Fundamental Constitutional Parental Right to Raise One's Children

One of the earlier United States Supreme Court cases[8] in respect to parental rights, and one that has been described in subsequent cases as seminal, is the case of *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), albeit it does not concern the rights of third parties. It is important primarily for its language, which stressed the importance of family in our society. Nebraska, apparently as a reaction to World War I war, enacted a statute that forbade the teaching of the German language to children who had not yet reached the eighth grade.

---

8. Some of the cases do not concern third-party custody but the power of states to interfere with parents' raising of their children. We include them here to emphasize the importance of parents' rights.

In the process of holding the statute unconstitutional, the Court said:

"The problem for our determination is whether the statute as construed and applied unreasonably infringes the liberty guaranteed to the plaintiff in error by the Fourteenth Amendment:

'No state shall deprive any person of life, liberty or property without due process of law.'

"While this court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. *Without doubt,* it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, *establish a home and bring up children,* to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

. . .

"For the welfare of his Ideal Commonwealth, Plato suggested a law which should provide:

'That the wives of our guardians are to be common, and their children are to be common, and no parent is to know his own child, nor any child his parent. . . . The proper officers will take the offspring of the good parents to the pen or fold, and there they will deposit them with certain nurses who dwell in a separate quarter; but the offspring of the inferior, or of the better when they chance to be deformed, will be put away in some mysterious, unknown place, as they should be.'

"In order to submerge the individual and develop ideal citizens, Sparta assembled the males at seven into barracks and intrusted their subsequent education and training to official guardians. *Although such measures have been deliberately approved by men of great genius their ideas*

*touching the relation between individual and state were wholly different from those upon which our institutions rest; and it hardly will be affirmed that any Legislature could impose such restrictions upon the people of a state without doing violence to both letter and spirit of the Constitution."*

*Meyer,* 262 U.S. at 399–402, 43 S.Ct. at 626–28 (citations omitted) (emphasis added).

One of the early cases citing to *Meyer, supra,* was *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary,* 268 U.S. 510, 530, 45 S.Ct. 571, 572–73, 69 L.Ed. 1070 (1925), involving the Oregon Compulsory Education Act. The Court opined:

"After setting out the above facts, the Society's bill alleges that the enactment conflicts with the right of parents to choose schools where their children will receive appropriate mental and religious training, the right of the child to influence the parents' choice of a school . . . and is accordingly repugnant to the Constitution and void.

. . .

"Under the doctrine of *Meyer v. Nebraska,* we think it entirely plain that the Act of 1922 unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control. . . . The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." [Citation omitted.]

In a case not exactly on point in a dispute between natural parents that involved competing state jurisdictions, *i.e.,* whether one state had the power to modify the custody determination of another state, the Court in *New York v. Halvey,* 330 U.S. 610, 613, 67 S.Ct. 903, 905, 91 L.Ed. 1133 (1947), opined:

"Under Florida law the 'welfare of the child' is the 'chief consideration' in [cases between natural parents] shaping the custody decree or in subsequently modifying or chang-

ing it. But 'the inherent rights of parents to enjoy the society and association of their offspring, with reasonable opportunity to impress upon them a father's or a mother's love and affection in their upbringing, must be regarded as being of an equally important, if not controlling, consideration in adjusting the right of custody as between parents in ordinary cases.' " [Citation omitted.]

In the 1970's the United States Supreme Court wrestled with a series of cases that, although not always directly concerning custody issues, continued to recognize the importance of the rights of parents.

In *Stanley v. Illinois,* 405 U.S. 645, 651–58, 92 S.Ct. 1208, 1210–16, 31 L.Ed.2d 551 (1972), the Court was considering an Illinois statute that mandated that, upon the death of a mother, the unmarried [to that mother] natural father had no right to a hearing on custody. The statute mandated that in such cases the children of the deceased mother automatically became dependents of the state. The Court said:

"Stanley presses his equal protection claim here. The State continues to respond that unwed fathers are presumed unfit to raise their children and that it is unnecessary to hold individualized hearings to determine whether particular fathers are in fact unfit parents before they are separated from their children. We granted certiorari, to determine whether this method of procedure by presumption could be allowed to stand in light of the fact that Illinois allows married fathers—whether divorced, widowed, or separated—and mothers—even if unwed—the benefit of the presumption that they are fit to raise their children.

. . .

"The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection. It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking

when appeal is made to liberties which derive merely from shifting economic arrangements.'

"The Court has frequently emphasized the importance of family. The rights to conceive and raise one's children have been deemed 'essential,' *Meyer v. Nebraska,* 'basic civil rights of man,' *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942), and '[r]ights far more precious ... than property rights,' *May v. Anderson,* 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221 (1953). 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment, *Griswold v. Connecticut,* 381 U.S. 479, 496, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring).

. . .

"Despite *Bell* and *Carrington,*[9] it may be argued that unmarried fathers are so seldom fit that Illinois need not undergo the administrative inconvenience of inquiry in any case, including Stanley's. The establishment of prompt efficacious procedures to achieve legitimate state ends is a proper state interest worthy of cognizance in constitutional adjudication. But the Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing con-

---

**9.** *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (statutory scheme depriving driving privileges without a finding of unfitness to drive); and *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (restriction of electorate to bona fide residents).

cern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones.

. . .

"We have concluded that all Illinois parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody." [Footnote added.] [Footnoted omitted.] [Some citations omitted.]

*Wisconsin v. Yoder*, 406 U.S. 205, 214–32, 92 S.Ct. 1526, 1532–42, 32 L.Ed.2d 15 (1972) while primarily concerning religious issues (Amish parents challenging a state requirement that their children go to school until they were sixteen), was also based in part on the fundamental rights of parents to raise their children. The Court stated:

"Thus, a State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on fundamental rights and interests and the traditional interest of parents with respect to the religious upbringing of their children so long as they, in the words of *Pierce* [*v. Society of the Sisters* ], 'prepare [them] for additional obligations.'

. . .

"Our holding in no way determines the proper resolution of possible competing interests of parents, children, and the State in an appropriate state court proceeding in which the power of the State is asserted on the theory that Amish parents are preventing their minor children from attending high school despite their expressed desires to the contrary. Recognition of the claim of the State in such a proceeding would, of course, call into question traditional concepts of parental control over the religious upbringing and education of their minor children recognized in this Court's past decisions . . . .

"The State's argument proceeds without reliance on any actual conflict between the wishes of parents and children.

It appears to rest on the potential that exemption of Amish parents from the requirements of the compulsory-education law might allow some parents to act contrary to the best interests of their children by foreclosing their opportunity to make an intelligent choice between the Amish way of life and that of the outside world. . . .

"Indeed it seems clear that if the State is empowered, as *parens patriae,* to 'save' a child from himself or his Amish parents by requiring an additional two years of compulsory formal high school education, the State will in large measure influence, if not determine, the religious future of the child. . . . [T]his case involves the fundamental interest of parents, as contrasted with that of the State, to guide the religious future and education of their children. *The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children.* This *primary* role of the parents in the upbringing of their children is now established *beyond debate* as an enduring American tradition. [The Court then cited to *Pierce* and *Meyer* ]." [Emphasis added.] [Some alteration added.]

In the exclusionary zoning case of *Moore v. City of East Cleveland,* 431 U.S. 494, 499–508, 97 S.Ct. 1932, 1935–40, 52 L.Ed.2d 531 (1977), a case involving an attempt to restrict residency requirements to immediate family as opposed to extended family, the Court noted:

"When a city undertakes such intrusive regulation of the family, neither *Belle Terre[ v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) ] nor *Euclid[ v. Ambler Realty,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) ] [seminal zoning cases] governs; the usual judicial deference to the legislature is inappropriate. 'This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.' A host of cases, tracing their lineage to *Meyer* . . . have consistently acknowledged a 'private realm of family life which the state cannot enter.' Of course, the family is not beyond regula-

tion. But when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation.

. . .

"Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural.

. . .

Justice Brennan in a concurring opinion in *Moore*, joined by Justice Marshall, further noted:

"In today's America, the 'nuclear family' is the pattern so often found in much of white suburbia. The Constitution cannot be interpreted, however, to tolerate the imposition by government upon the rest of us of white suburbia's preference in patterns of family living. The 'extended family' that provided generations of early Americans with social services and economic and emotional support in times of hardship, and was the beachhead for successive waves of immigrants who populated our cities, remains not merely still a pervasive living pattern, but under the goad of brutal economic necessity, a prominent pattern—virtually a means of survival—for large numbers of the poor and deprived minorities of our society. For them compelled pooling of scant resources requires compelled sharing of a household." [Citations omitted.] [Footnotes omitted.]

*Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 829–40, 97 S.Ct. 2094, 2101–07, 53 L.Ed.2d 14 (1977),[10] while decided on procedural grounds, did

---

**10.** It is possible to make an inference from the tone of the opinion that the organizations of foster parents were additionally, if not primarily,

involve third parties but in respect to the position of the state. There was an unusual twist. Foster parents formed several organizations to challenge the procedures New York used to reunite foster children with their natural parents and in the process attempted to assume the stature of "psychological parents." In the opinion reference is also made to the interests of natural parents. In discussing the various issues the Court opined:

"The provisions of the scheme [the state process for reunification] specifically at issue ... come into play when the agency ... determines to remove the foster child from the foster home, either because it has determined that it would be in the child's best interests to transfer him to some other foster home, or to return the child to his natural parents in accordance with the statute or placement agreement.

. . .

"From the standpoint of natural parents, such as the appellant intervenors here, foster care has been condemned as a class-based intrusion into the family life of the poor. It is certainly true that the poor resort to foster care more often than other citizens.... Minority families are also more likely to turn to foster care .... This disproportionate resort to foster care by the poor and victims of discrimination doubtless reflects in part the greater likelihood of disruption of poverty-stricken families.... The poor have little choice but to submit to state-supervised child care when family crises strike.

. . .

"The intervening natural parents of children in foster care ... also oppose the foster parents, arguing that recognition of the procedural right claimed [the right to a hearing for the foster parents if they were deemed to be psychological

---

concerned with the effect of the statute on the economic circumstances of foster parents.

parents and the equivalent of natural parents] would undercut both ... and their constitutionally protected right of family privacy, by forcing them to submit to a hearing and defend their rights to their children before the children could be returned to them." [Citations omitted.] [Footnote omitted.]

After discussing that the relationship of foster parents were based on the contracts between them and the state, the Court opined further:

"A second consideration related to this is that ordinarily procedural protection may be afforded to a liberty interest of one person without derogating from the substantive liberty of another. Here, however, such a tension is virtually unavoidable.... It is quite another to say that one may acquire such an interest in the face of another's constitutionally recognized liberty interest that derives from blood relationship, state-law sanction, and basic human right-an interest [the interest of the natural parent] the foster parent has recognized by contract from the outset. Whatever liberty interest might otherwise exist in the foster family as an institution, that interest must be substantially attenuated where the proposed removal from the foster family is to return the child to his natural parents."

*Smith*, 431 U.S. at 846–47, 97 S.Ct. at 2110–11 (footnote omitted).

*Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), was a factually unusual case, and is one of, if not the only, case in which the Supreme Court upheld the sole use of the "best interests" standard in regard to the third-party placement of children, although at the same time it opined that *if a parent were fit* it would generally be constitutionally prohibited to take custody from that parent on the basis of the "best interest of the child." First, the father had never wed the mother and the child had been raised by her mother and stepfather; second, it was an adoption case; third, it was the stepfather who was seeking to adopt the child and the stepfather had been married to the child's mother for the nine years

prior to the petition for adoption; and fourth, the natural father only sought the power to veto the adoption unless he was first declared to be unfit which had not happened and he did not want custody for himself. It appears under those circumstances that the Court almost considered that the natural father had waived or forfeited his constitutional rights as a natural father, although the Court did not specifically so state. The father also claimed that the law in Georgia that permitted a natural father who had been wed to the mother to veto adoptions, but did not afford the same veto right to a natural father who had not been married to the mother, was unconstitutional in that it denied him the equal protection of the law.

Because the trial court had used "best interests" language that was then used by the state appellate court opinion, that language also ended up in the Supreme Court's decision. The Court opined:

"The trial court denied appellant's petition, and thereby precluded him from gaining veto authority, on the ground that legitimation was not in the 'best interest of the child'; appellant contends that he was entitled to recognition and preservation of his parental rights absent a showing of his 'unfitness.' Thus, the underlying issue is whether, in the circumstances of this case and in light of the authority granted by Georgia law to married fathers, appellant's interests were adequately protected by a 'best interest of the child' standard.

. . .

"We have little doubt that the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, *without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.*' But this is not a case in which the unwed father at any time had, or sought, actual or legal custody of his child. Nor is this a case in which the proposed adoption would place the child with a new set of parents with whom the child had never before lived. Rath-

er, the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except appellant. *Whatever might be required in other situations,* we cannot say that the State was required in this situation to find anything more than that the adoption, and denial of legitimation, were in the 'best interests of the child.' "

*Quilloin,* 434 U.S. at 254–55, 98 S.Ct. at 554–55 (citation omitted) (emphasis added).

Interestingly, a year later the Court addressed a similar issue as to equal protection significantly differently, also in an adoption case, albeit based upon gender discrimination claims. In the case of *Caban v. Mohammed,* 441 U.S. 380, 381–94, 99 S.Ct. 1760, 1763–69, 60 L.Ed.2d 297 (1979), the Court stated:

"The appellant, Abdiel Caban, challenges the constitutionality of [the relevant section of the adoption statute of New York], under which two of his natural children were adopted by their natural mother and stepfather without his consent. We find the statute to be unconstitutional, as the distinction it invariably makes between the rights of unmarried mothers and unmarried fathers has not been shown to be substantially related to an important state interest.

. . .

"Absent one of these circumstances, an unwed mother has the authority under New York law to block the adoption of her child simply by withholding consent. The unwed father has no similar control over the fate of his child, even when his parental relationship is substantial—as in this case. *He [under the statute ] may prevent the termination of his parental rights only by showing that the best interests of the child would not permit the child's adoption by the petitioning couple.*

"Despite the plain wording of the statute, appellees [the natural mother and stepfather] argue that unwed fathers are not treated differently under [the statute] from other parents. According to appellees, the consent requirement

of [the statute] is merely a formal requirement, lacking in substance, as New York courts find consent to be unnecessary whenever the best interests of the child support the adoption. Because the best interests of the child always determine whether an adoption petition is granted in New York, appellees contend that all parents, including unwed fathers, are subject to the same standard.

"Appellees' interpretation ... finds no support in New York case law. On the contrary, the New York Court of Appeals has stated unequivocally that the question whether consent is required is entirely separate from that of the best interests of the child.... Accordingly, it is clear that [the statute] treats unmarried parents differently according to their sex.

"The question before us, therefore, is whether the distinction in [the statute] between unmarried mothers and unmarried fathers bears a substantial relation to some important state interest. Appellees assert that the distinction is justified by a fundamental difference between maternal and paternal relations—that 'a natural mother, absent special circumstances, bears a closer relationship with her child ... than a father does.'

. . .

"In sum, we believe that [the statute] is another example of 'overbroad generalizations' in gender-based classifications. The effect of New York's classification is to discriminate against unwed fathers even when their identity is known and they have manifested a significant paternal interest in the child.

*Id.* at 381–94, 99 S.Ct. at 1763–69 (alterations added) (citations omitted) (emphasis added) (footnotes omitted).

The Court then stated in a footnote:

"Because we have ruled that the New York statute is unconstitutional under the Equal Protection Clause, we ... express no view as to whether a State is constitutionally barred from ordering adoption in the absence of a determi-

nation that the parent whose rights are being terminated is unfit."

*Id.* at 394, 99 S.Ct. at 1769.

Even in *Lassiter v. Department of Social Services of Durham County,* 452 U.S. 18, 27, 101 S.Ct. 2153, 2159–60, 68 L.Ed.2d 640 (1981), a case in which the Supreme Court upheld the denial of legal representation for indigent parents in state generated termination cases, the Court nevertheless, recognized the fundamental and constitutional rights of parents to raise their children:

> "This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.' Here the State has sought not simply to infringe upon that interest but to end it. If the State prevails, it will have worked a unique kind of deprivation. A parent's interest in the accuracy and injustice of the decision to terminate his or her parental status is, therefore, a commanding one." [Citations omitted.]

In a case involving the correct evidentiary standards to apply in cases where the State attempts to terminate parental rights, the Court held that a preponderance of the evidence standard was not sufficient and that "at least clear and convincing evidence" was required. In *Santosky v. Kramer,* 455 U.S. 745, 747–67, 102 S.Ct. 1388, 1391–402, 71 L.Ed.2d 599 (1982), the Court discussed the importance of the fundamental rights of parents:

> "Today we hold that the Due Process Clause of the Fourteenth Amendment demands more than this [the preponderance standard]. Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence."

The Court went on to give its reasons, reasons based upon the fundamental rights of parents:

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protection than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

. . .

"At the factfinding, the State cannot presume that a child and his parents are adversaries. *After the State has established parental unfitness at that initial proceeding,* the court may assume at the *dispositional* [this emphasis in original], stage that the interests of the child and the natural parents do diverge.... But until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship. Thus, at the factfinding, the interests of the child and his natural parents coincide to favor use of error-reducing procedures.

. . .

"The [state] court's theory assumes that termination of the natural parents' rights invariably will benefit the child. Yet we have noted above that the parents and the child share an interest in avoiding erroneous termination. Even accepting the court's assumption, we cannot agree with its conclusion that a preponderance standard fairly distributes the risk of error between parent and child. Use of that standard reflects the judgment that society is nearly neutral between erroneous termination of parental rights and erroneous failure to terminate those rights. For the child, the likely consequence of an erroneous failure to terminate is

preservation of an uneasy status quo. For the natural parents, however, the consequence of an erroneous termination is the unnecessary destruction of their natural family.

. . .

" '[T]he State registers no gain towards its declared goals when it separates children from the custody of *fit* parents.' " [Citations omitted.] [Footnotes omitted.] [Some emphasis added.]

*Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), was another unique case. The unwed natural father had not received notice of an adoption case in respect to his child and accordingly did not appear and thus never proffered any testimony as to his contact with the children. Based only on the appellee's evidence, the Court held that because the natural father had never established a significant relationship with the child, the failure of the lower court to give him notice of the adoption proceedings, even though the state had knowledge of his whereabouts, did not violate his constitutional rights, since the natural father could have guaranteed receipt of notice by sending a postcard to some registry. Justice White, dissenting, with Justices Marshall and Blackmun joining, pointed out that the majority was making assumptions as to the nature of the father's relationship with the child, without the father ever having had a chance to present evidence in respect to that relationship. Even in holding against the father, the majority nonetheless recognized the importance of parental rights, quoting from its cases, *supra,* before, in essence, nullifying his status as the natural father because it found that he had not established a sufficient relationship with the child.

*Reno v. Flores,* 507 U.S. 292, 294–304, 113 S.Ct. 1439, 1444, 123 L.Ed.2d 1 (1993), involved the increasingly serious problems of what to do with minor illegal aliens who have no natural parents or legal guardians in this country. Detained minor aliens who were subject to deportation by INS, by reason of certain statutes, were treated differently than de-

tained minors held for "exclusion." Apparently, the deportable minor aliens were not swiftly turned over to others, but rather kept in detention for extended periods of time.[11] The Court described the issue: "Over the past decade, the Immigration and Naturalization Service (INS or Service) has arrested increasing numbers of alien juveniles who are not accompanied by their parents or other related adults. Respondents, a class of alien juveniles so arrested and held . . . contend that the Constitution and immigration laws require them to be released into the custody of 'responsible adults.'" *Id.* at 294, 113 S.Ct. at 1443. In resolving the issue, the Court compared the situation to the matters of custody in respect to natural parents of citizens. Perhaps, as dicta, given the nature of the particular case, the Court stated:

"Although respondents [the alien minors] generally argue for the categorical right of private placement discussed above, at some points they assert a somewhat more limited constitutional right: the right to an individualized hearing on whether private placement would be in the child's 'best interests'—followed by private placement if the answer is in the affirmative. It seems to us, however, that if institutional custody (despite the availability of responsible private custodians) is not unconstitutional in itself, it does not become so simply because it is shown to be less desirable than some other arrangement for the particular child. 'The best interests of the child,' a venerable phrase familiar from divorce proceedings, is a proper and feasible criterion for making the decision as to which of two parents will be accorded custody. But it is not traditionally the sole criterion—much less the sole *constitutional* criterion—for other, less narrowly channeled judgments involving children, where their interests conflict in varying degrees with the interests of others. Even if it were shown, for example, that a particular couple desirous of adopting a child would *best* provide for the child's welfare, the child would nonethe-

---

11. There apparently are upwards of nine thousand minors held in this category each year.

less not be removed from the custody of its parents so long as they were providing for the child *adequately*. Similarly, 'the best interests of the child' is not the legal standard that governs parents' or guardians' exercise of their custody: So long as certain minimum requirements of child care are met, the interests of the child may be subordinated to the interests of other children, or indeed even to the interests of the parents or guardians themselves."

*Id.* at 303–04, 113 S.Ct. at 1448 (citations omitted).

In *M.L.B. v. S.L.J.*, 519 U.S. 102, 116, 117 S.Ct. 555, 564, 136 L.Ed.2d 473 (1996), the Court reversed a Mississippi case which had upheld a state statute that required certain fees to be paid before an appeal could be taken. The appellant, an indigent mother, had her appeal of the termination of her parental rights dismissed because she lacked the money to pay the fees. The issue was whether the fundamental rights of parents were sufficiently strong, making the statute, or its application to an indigent parent, unconstitutional. The Court found for the mother. Justice Ginsburg writing for the Court stated that:

"Choices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as 'of basic importance in our society,' rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect. M.L.B's case, involving the State's authority to sever permanently a parent-child bond demands the close consideration the Court has long required when a family association so undeniably important is at stake.

. . .

"Although both *Lassiter* and *Santosky* yielded divided opinions, the Court was unanimously of the view that 'the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment.' It was also the Court's unanimous view that '[f]ew conse-

quences of judicial action are so grave as the severance of natural family ties.'" [Alteration original.] [Citations omitted.] [Footnote omitted.]

In the recent case of *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), the Court reaffirmed its principles, in a challenge to a third-party visitation statute in the state of Washington. Accordingly, we shall also examine it.

In *Troxel,* a mother desired to limit her children's visitation with the parents of their deceased father, a man to whom she had never been married. The paternal grandparents invoked a Washington statute that permitted any person to petition the superior court for visitation rights of any child at any time, and gave discretion to the court to grant visitation when in the best interest of the children, without regard to any change in circumstances. *Troxel,* 530 U.S. at 60, 120 S.Ct. at 2057. After the trial court ordered visitation with the grandparents in excess of the mother's desires, she appealed to Washington's intermediate appellate court, which reversed the lower court, stating that the grandparents lacked standing unless a custody action was pending. *Id.* at 62, 120 S.Ct. at 2058. The Washington Supreme Court affirmed, holding the non-parental visitation statute invalid, but based its decision on substantive due process grounds. *Id.* at 63, 120 S.Ct. at 2058. The grandparents appealed to the United States Supreme Court, which affirmed, holding that the statute on which the superior court had based its order awarding visitation to the paternal grandparents unconstitutionally interfered with the mother's "fundamental right to make decisions concerning the care, custody, and control of her" children. *Troxel,* 530 U.S. at 72, 120 S.Ct at 2063. In criticizing the trial court's "slender findings" in support of its visitation order, the United States Supreme Court faulted the statute's failure to accord sufficient deference to the parent's interests, and, as the Maryland Court of Special Appeals in a decision issued less than a month after *Troxel,* further critiqued:

"that the [trial court] decision placed the burden on the parent to prove that grandparent visitation was not in the

child's best interest; and that there was no requirement that the parent be shown to be unfit. The Court expressly declined, however, to reach the question of whether parental unfitness was always a prerequisite in order to justify intervention in decisions concerning custody and visitation." *Gestl v. Frederick,* 133 Md.App. 216, 242, 754 A.2d 1087, 1101 (2000) (alteration added). In addition, *Troxel* observed that the trial court did not order non-parental visitation based upon "any special factors [*i.e.,* exceptional circumstances] that might justify the State's interference with [the mother's] fundamental right to make decisions concerning the rearing of her [children]" *Troxel,* 530 U.S. at 68, 120 S.Ct. at 2061 (alterations added); *see also Gestl,* 133 Md.App. at 243, 754 A.2d at 1101.

As we have said, *Troxel* involved a Washington statute. We note, in respect to custody, that no specific statute has been invoked by the parties in the case *sub judice.*[12] There is, however, significant insight to be gleaned from *Troxel's* discussion of the fundamental rights of parents to rear their children. Moreover, Judge Wilner, for the Court, recently observed in *Frase v. Barnhart,* 379 Md. 100, 840 A.2d 114 (2003), in respect to the *Troxel* plurality opinion, that "there is nothing in any of the Opinions announcing or concurring in the judgment to suggest that the Constitutional proscription against State interference with a fit parent's right to make basic decisions for his/her child is limited to issues of visitation, and, indeed, the cases relied on by the various Justices involved other areas of interference as well." *Id.* at 124, 840

---

**12.** There is a grandparents visitation statute in Maryland, but there is no statute specifically addressing a petition by grandparents for custody. Md.Code (1984, 1999 Repl.Vol., 2004 Supp.), § 9–102 of the Family Law Article, entitled "Petition by grandparents for visitation," provides:

"An equity court may:
(1) consider a petition for reasonable visitation of a grandchild by a grandparent; and
(2) if the court find it to be in the best interests of the child, grant visitation rights to the grandparent."

This statute is not at issue in this case.

A.2d at 128 (citations omitted). We discussed several of the cases discussed in *Troxel* in *Boswell v. Boswell,* 352 Md. 204, 721 A.2d 662 (1998), stating:

"The United States Supreme Court has upheld the rights of parents regarding the care, custody, and management of their children in several contexts, including child rearing, education, and religion. *See Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (overturning a mandatory schooling law in the face of Amish claims of parental authority and religious liberty); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (discussing the right of parents to raise their children); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, 652 (1944) (observing that 'the custody, care, and nurture of the child reside first in the parents'); *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, 1660 (1942) (stating the right to rear a child is encompassed within a parent's 'basic civil rights'); *Pierce v. Society of Sisters of Holy Names,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (sustaining parents' authority to provide religious schooling against State requirements of public school attendance); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (upholding parental authority to have children taught in languages other than English)."

*Boswell,* 352 Md. 204, 217–18, 721 A.2d 662, 668.

Petitioner reads *Troxel* as requiring a threshold showing of harm or potential harm to the child where third parties seek custody. Although the Washington Supreme Court did address the harm or potential harm issue, the plurality opinion in *Troxel,* as we have already noted, did not address the issue in respect to the granting of *visitation*—the issue in *Troxel:*

"[W]e do not consider the primary constitutional question passed on by the Washington Supreme Court—whether the Due Process Clause requires all nonparental visitation stat-

utes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation."

*Troxel,* 530 U.S. at 73, 120 S.Ct. at 2064 (alteration added).

Instead, the *Troxel* decision affirmed the Washington Supreme Court's invalidation of a state statute because the Due Process Clause does not permit a State to "infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Troxel,* 530 U.S. at 72–73, 120 S.Ct. at 2064. Accordingly, *Troxel* is further instructive as to this case insofar as it recognizes the parent's fundamental right to direct his or her children's care, custody and control, *see Troxel,* 530 U.S. at 65, 120 S.Ct. at 2060, and it impliedly rejects the substitution of a judge's opinion that a particular child would be better raised in a situation a trial judge prefers.[13]

Our courts have left little doubt of the importance placed on the parent-child relationship. As this Court recently stated in *Shurupoff v. Vockroth:*

"The Supreme Court has long recognized the right of a parent to raise his or her children as a fundamental one protected by the due process clause of the Fourteenth Amendment. *See* cases beginning with *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), extending, among other intermediate cases, through *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), and *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct.

---

**13.** Every child might be "better" in a different situation in the opinion of one judge or another. The "best interest" standard is not a rule to be used to take children away from fit parents and give them to third parties because a judge believes the child will be better off with richer, better educated, more stable, third parties. If that were so, no parent would be safe from having his or her children given to others to raise. The phrase "best interests of the child" is not synonymous with "with whomever the child would be better off." Children are born into different circumstances. They are dealt different hands. The vast majority of them cope. Some from humble origins and upbringing even end up on state supreme courts. It is simply the way life is.

1388, 71 L.Ed.2d 599 (1982), to, most recently, *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)."

*Shurupoff,* 372 Md. at 650, 814 A.2d at 550.

The circumstances of the case *sub judice* illuminate a complexity in the "best interests of the child" standard that governs, *inter alia,* custody disputes between parents. In a situation in which both parents seek custody, each parent proceeds in possession, so to speak, of a constitutionally-protected fundamental parental right. Neither parent has a superior claim to the exercise of this right to provide "care, custody, and control" of the children. *See* Md.Code (1984, 1999 Repl.Vol., 2004 Supp.), § 5–203(d)(2) of the Family Law Article.[14] Effectively, then, each fit parent's constitutional right neutralizes the other parent's constitutional right, leaving, generally, the best interests of the child as the *sole standard* to apply to these types of custody decisions. Thus, in evaluating each parent's request for custody, the parents commence as presumptive equals and a trial court undertakes a balancing of each parent's relative merits to serve as the primary custodial parent; the child's best interests tips the scale in favor of an award of custody to one parent or the other.

 Where the dispute is between a fit parent and a private third party, however, both parties do not begin on equal footing in respect to rights to "care, custody, and control" of the children. The parent is asserting a fundamental constitutional right. The third party is not. A private third party has no fundamental constitutional right to raise the children of others. Generally, absent a constitutional statute, the non-governmental third party has no rights, constitutional or otherwise, to raise someone else's child.

---

**14.** Md.Code (1984, 1999 Repl.Vol., 2004 Supp.), § 5–203(d)(2) of the Family Law Article states, "Neither parent is presumed to have any right to custody that is superior to the right of the other parent."

## B. Best Interests of the Child in the Absence of Parental Unfitness and Extraordinary or Exceptional Circumstances

The arguments and outcome of the instant case in no way alter the "best interests of the child" standard that governs courts' assessments of disputes *between fit parents* involving visitation or custody. We have frequently and repeatedly emphasized that in situations where it applies, it is the central consideration. *See Wilhelm v. Wilhelm,* 214 Md. 80, 84, 133 A.2d 423, 425 (1957) (stating succinctly and conclusively in regard to the best interests standard, that "[i]t seems unnecessary to cite additional authority in support of this firmly established rule"). So critical is the best interests standard that it has garnered superlative language in the many cases in which the concept appears: This Court labeled it "of transcendent importance" in *Dietrich v. Anderson,* 185 Md. 103, 116, 43 A.2d 186, 191 (1945), as the "ultimate test" in *Fanning v. Warfield,* 252 Md. 18, 24, 248 A.2d 890, 894 (1969), and as the "controlling factor" in *In re Adoption/Guardianship No. 10941,* 335 Md. 99, 113, 642 A.2d 201, 208 (1994). *See also Hoffman,* 280 Md. at 175, n. 1, 372 A.2d at 585 n. 1 (providing a more complete survey of the various descriptions of the best interest standard). Although the child's well-being remains the focus of a court's analysis in disputes between fit parents, "[t]he best interests standard does not ignore the interests of the parents and their importance to the child. We recognize that in almost all cases, it is in the best interests of the child to have reasonable maximum opportunity to develop a close and loving relationship with each parent." *Boswell v. Boswell,* 352 Md. 204, 220, 721 A.2d 662, 669 (1998) (alteration added).

## C. Standards for Custody Determination

■ When considering the application of the "best interests of the child" standard it is essential to frame the different situations in which it is attempted to be applied. First, and certainly the most important application of the standard, is in disputes between fit natural parents, each of whom has equal constitutional rights to parent. In those cases the dispute can

be resolved best if not solely, by an application of the "best interests of the child" standard. This situation most often arises in marriage dissolution issues between natural parents and it is necessary to resolve the matters of custody and visitation between two constitutionally equally qualified parents. Although the Court is unaware of any compilation of numbers, it can reasonably be supposed that the vast majority of cases throughout the country in which the "best interest of the child standard" is applied, or sought to be applied, are of this nature. When these cases are subtracted from the total universe of custody and visitation cases, there remains a much smaller number of cases.

The second most frequent situation in which that standard has been applied is, we believe, in the various types of state proceedings in which the states are injecting themselves into the parenting situation in the exercise of their generally recognized power to protect the child. In various jurisdictions, and sometimes in different cases within the same jurisdiction, the standard applied, after recognizing the power of the state to intervene in the case by reason of unfitness or circumstance, is an avoidance of harm to the child or a "best interest" standard, and often both standards. Most often the best interest standard becomes applicable after a finding that it is necessary to protect the child who is being exposed to harm by the parental unit. When these numerous cases are subtracted from the total number of custody and visitation dispute cases, the remainder of the cases fit into an even smaller category.

This category is generically referred to as "third-party" custody disputes, *i.e.*, persons other than natural parents or the State attempting, directly or indirectly, to gain or maintain custody or visitation in respect to the children of natural parents. In some states, third-party issues arise in actions involving those states' use of guardianship, *i.e.*, custody actions appear to be titled sometimes as guardianship actions although they are in essence custody actions. In some states the actions are titled as habeas corpus actions, in some states the third party seeks custody through intervention in a domes-

tic action between the natural parents (as in the present case), and in some states the third party initiates a separate action titled in some other manner.

Even within the third-party subset of custody actions there are further differences. Some states have conceptualized the idea of physiological parents, third parties who have, in effect, become parents and thus, the case is considered according to the standards that apply between natural parents. This further reduces the number of pure third-party cases. The pure third-party cases are further narrowed in some jurisdictions by "failure of adoption" cases, in which, upon the "failure of adoption," a "best interest" standard may be applied. In still other pure third-party cases, in respect to the standard to be used, all parties seeking custody of children are designated as third parties. In that situation there are no constitutional rights involved (although in some cases constitutional claims are made using terms such as "psychological parent" and the like) and the "best interest" standard is generally applied. There are also those cases which we would otherwise call pure third-party cases, except that the natural parents did not raise the issue of their fundamental constitutional right to parent in that particular case and the courts accordingly did not address it. These cases further reduce the body of cases that we shall discuss. Indeed, other types of situations may further reduce the number of pure third-party cases.

In any event, in comparison with the total number of cases in which attempts are made to utilize the "best interest" standard, or it is used, the number of pure third-party cases, such as the present case, is relatively small. It is on these remaining cases throughout the country, that we primarily focus our attention.[15]

We have been able to separate the cases (and the states) into three categories. First, those that utilize, as the ultimate determining factor, the "best interest" standard (which ap-

---

15. Some of these issues are presented in the guise of various state actions in which third-party custody is indirectly implicated. These cases will be apparent from context.

pears to be the minority view). Second, those cases (and the states) that appear to use some type of hybrid standard or have utilized language in the opinions that support both the "best interest" standard and the "unfit parent" and/or "extraordinary circumstances" standard. We shall refer to these cases as the hybrid view. The third category of cases, which appear to be the majority of the cases and the states, hold that, in this limited class of pure third-party custody cases (the category of the present case), that the "best interest" standard is inappropriate unless the finder of fact *first* finds that the natural parents are unfit, the natural parents by their conduct have waived or lost their "constitutional protections," or there is a finding of extraordinary, exceptional, or compelling circumstances that require the court to remove the child from the natural parents in order to protect the child from harm. It is only if the parents are unfit, or if there is some exceptional circumstance exposing the child to harm, that the child may be removed from the custody of the parents. If a preliminary finding of parental unfitness or extraordinary circumstances is made, the court is then faced with what to do with the child. In only that context, then, after such preliminary findings are proved, may the custody of the child be based on a "best interest" standard. This last standard appears to be the majority view in the United States and, until very recently, likely was the Maryland position, albeit the language of our cases over the years has not been altogether clear. To the extent we may not have explicitly previously adopted the majority view in third-party custody cases in this state, we do so now.

We shall discuss, for the most part, only the pure third-party cases since the early 1970's—the era when the Supreme Court, in various types of cases, re-emphasized the constitutional rights of parents.

### 1. Minority View

We start with what we consider to be the minority view: the states that apply the "best interest" standard, and generally only, or ultimately, this standard, in spite of some dicta in the

cases to the contrary.[16] These states appear to be Colorado, Illinois,[17] Pennsylvania and West Virginia (although there are contrary cases in West Virginia).[18] In 1981 the Supreme Court of Illinois, in *In re Custody of Townsend*, 86 Ill.2d 502, 56 Ill.Dec. 685, 427 N.E.2d 1231 (1981), overturned the granting of custody to a third party (the sister of the child) over the protest of the child's natural father who had not been married to the natural mother.[19] Although the court considered the father's presumptive rights, it included language which, it can be argued, place Illinois in the minority column:

> "In child-custody disputes it is an accepted presumption that the right or interest of a natural parent in the care, custody and control of a child is superior to the claim of a third person. The presumption is not absolute and serves only as one of several factors used by courts in resolving the *ultimately controlling question of where the best interests of the child lie*. A court need not find that the natural parent is unfit or has forfeited his custodial rights before awarding custody to another person if the best interests of the child will be served." [20]

---

16. Our discussion of the state cases in the various categories is not done in alphabetical order but in a more or less random order.

17. The Supreme Court of New Jersey has recently described Illinois as ascribing to the majority view. *See Watkins v. Nelson*, 163 N.J. 235, 748 A.2d 558 (2000).

18. It is arguable that this Court in *Shurupoff v. Vockroth*, 372 Md. 639, 814 A.2d 543 (2003), in attempting to clarify some of the language in *Hoffman*, 280 Md. 172, 372 A.2d 582 (1977), may have moved Maryland from the majority view to the minority status. We shall address this later in the opinion.

19. The child's natural mother had murdered the natural father's wife and had been sentenced to thirty years in prison.

20. Even then the Illinois Supreme Court in later language in the opinion appeared to back away from its pronouncement, when it stated: "These holdings [various United States Supreme Court cases], however, make it clear that the interest of a parent ... is fundamental and not to be ignored or facilely swept away in the face of a competing petition for custody filed by a third party." *In re Townsend*, 86 Ill.2d at 514, 56 Ill.Dec. 685, 427 N.E.2d at 1237.

*Id.* at 508, 56 Ill.Dec. 685, 427 N.E.2d at 1234 (citations omitted) (emphasis added). *See also In re the Estate of K.E.S. and J.M.S., Minors,* 347 Ill.App.3d 452, 461, 283 Ill. Dec. 76, 807 N.E.2d 681, 688 (2004), decided on somewhat different grounds, but stating nonetheless, that "[t]he most important consideration in child custody disputes is the best interest of the child" (alteration added). The intermediate appellate court relied primarily on its own cases, but did cite at one point to the Illinois Supreme Court's *Townsend* decision. *But see In re Petition of Kirchner,* 164 Ill.2d 468, 208 Ill.Dec. 268, 649 N.E.2d 324 (1995), a failure of adoption case which contains some contrary language and *In re Custody of Peterson,* 112 Ill.2d 48, 96 Ill.Dec. 690, 491 N.E.2d 1150 (1986), which sets the standard in Illinois that applies where the children in a nonparent/parent custody dispute are not in the custody of the natural parent. It requires a nonparent first to establish that the child is not in the custody of the natural parent before the custody dispute is determined based upon the "best interest" test.

We include in the minority line of cases the very unusual West Virginia case of *Lindsie D.L. v. Richard W.S.,* 214 W.Va. 750, 591 S.E.2d 308 (2003), even though the third party seeking visitation was the half-sister of the child and was asserting her own alleged constitutional rights as a sibling. The child's natural father (who was not the father of the half-sister) objected, based upon his fundamental rights as a parent. The case had been dismissed below because the trial court had found that "there was no legal right of visitation with a minor half-sibling." The West Virginia Supreme Court of Appeals held: "[W]e now conclude that Lindsie [the half-sister seeking visitation] may have a right to continued visitation with her half-sibling." *Id.* at 754, 591 S.E.2d at 312. It then remanded the case to the trial court for it first to "hear and determine whether or not visitation with her half-sister, Cassandra, is in the best interests of Lindsie [the half-sister seeking visitation] ... [and] also hear and determine whether such visitation is in the best interests of Cassandra [the sister with whom visitation was sought]. In making this determina-

tion there is a presumption that [the natural father] is acting in the best interests of Cassandra." *Id.* at 756, 591 S.E.2d at 314 (alterations added).

In *In re the Custody of A.D.C., Child.,* 969 P.2d 708, 710 (Colo.App.1998), that court awarded custody to grandparents as against the natural mother. The court first described the pertinent issue:

"[The natural] Mother further argues that due process and the legal presumption in favor of the biological parent require that a parent be awarded custody unless it is shown by clear and convincing proof that the child would suffer emotional or physical harm by such an award. Again, we disagree.

"Under [a Colorado statute] the determination of custody is expressly based upon the best interests of the child. Furthermore, due process does not require a showing of unfitness before custody may be awarded to a non-parent." [Alterations added.] [Citations omitted.]

The Supreme Court of Pennsylvania in *Charles v. Stehlik,* 560 Pa. 334, 341–42, 744 A.2d 1255, 1258–59 (2000), reaffirmed a prior decision when it opined:

"Next, Appellant [natural father] argues that Appellee [stepfather] should have been required not only to prove that there were convincing reasons as to why [the child] should remain with Appellee, but also that Appellant was an unfit parent.

"In *Albright v. Commonwealth,* 491 Pa. 320, 421 A.2d 157, 161 (1980), we stressed that the biological parent's prima facia right to custody

'is not to be construed as precluding a custody award to a non-parent, absent a demonstration of the parent's dereliction. We again emphasize that the standard seeks only to stress the importance of parenthood as a factor in determining the best interests of the child. However, other factors which have significant impact on the well being of the child can justify a finding in favor of the non-

parent, even though the parent has not been shown to have been unfit.'

"We see no reason to abandon our *Albright* holding. As noted *supra,* 'the cardinal concern in all custody cases is the best interest and permanent welfare of the child.'" [Alterations added.]

## 2. Hybrid View[21]

Next we discuss the cases that contain language, that supports, so to speak, a composite of the majority and the minority views. In some instances it is difficult to determine where these particular states are in respect to the various views. In some of the cases, such as those from Vermont, the language also would support that state as being among the majority view that we shall later discuss. These states that we consider to be somewhere in the middle include the states of Oregon, Connecticut, Vermont, Washington, Missouri, Louisiana, Maine, Nevada, Arkansas, Nebraska, Texas, perhaps California and, currently, perhaps this state. In some of the states the cases are intermediate appellate court cases, and in some of the states various intermediate appellate decisions differ. In some, both positions are found within the same opinion. This is perhaps a result of the confusion that the term 'best interests' can generate when applied in differing contexts.

Although the court in the Vermont case of *In re S.B.L.,* 150 Vt. 294, 553 A.2d 1078 (Vt.1988), actually decided that an unmarried father of a child born out of wedlock did not enjoy the parental presumption of fitness, it utilized language that indicated that its position emphasized the "best interest" standard. In essence, it first found that under Vermont law a father (not married to the mother) of a child was not consid-

---

**21.** The Supreme Court of New Jersey in *Watkins v. Nelson,* 163 N.J. 235, 748 A.2d 558 (2000), which we address, *infra,* places the states of Vermont, Utah, Louisiana, Nevada, and Wyoming as states ascribing to the majority view. We place them in the hybrid category because some of the language of the cases is not clear.

ered to be the natural father and thus not entitled to the presumptions afforded a natural parent. Thus, it considered the dispute as between two third parties [to which the best interests test always applies]. The Vermont Supreme Court first noted:

> "The instant case is novel because it is presented as a custody fight between a father of a child born out of wedlock, and a person who is neither the spouse of that party nor a parent of the child over whom custody is sought. As none of our modern cases involve parties of either of these classes, the presence of both as adversaries in a single case requires us to break substantial new ground."

*Id.* at 298–300, 553 A.2d at 1081. At this point the Vermont court noted in a footnote that:

> "Our one precedent on the respective custody rights of parents and third parties was decided in 1926. Although the child in [that case] was in the care of a grandparent, the custody order awarded custody to the child's father. Two recent cases have involved proceedings to award guardianship of a child to a third party because the parent is 'unsuitable.' "

*Id.* at 300 n. 1, 553 A.2d at 1081 n. 1 (alteration added) (citations omitted).

After first noting that the unmarried father of a child born out of wedlock was, according to Vermont law and to the common law, not presumed to be a parent, that court stated:

> "There is no per se statutory preference in favor of the natural father of a child born out of wedlock, and the statute does not impose on third parties seeking custody the initial burden of proving the father to be incompetent or unsuitable.
>
> . . .
>
> "For the above reasons, the statute does not prevent a grandparent from competing on an equal footing with a biological father for the guardianship and custody of an

illegitimate child. If the statute alone controlled, we would have to reverse the judgment for the father ...."

. . .

"Because the father in *Lehr* [22] had not come forward to participate in the rearing of his child, he had no cognizable due process interest.... "However, to deny such status to a biological father who has developed the requisite custodial, personal or financial relationship with the child denies equal protection of the law to the biological father under the principles set forth in *Lehr*.

"We conclude therefore that granting guardianship to a third person in preference to a parent who has demonstrated a commitment to parenthood based solely on a judicial determination of the best interests of the child—without first requiring the third party to demonstrate that the parent is unfit—denies the natural parent due process of law."

*S.B.L.*, 150 Vt. at 301–05, 553 A.2d at 1083–85 (footnote added).

While the case appears to be distinguishable from the minority and perhaps deserves instead to be in the majority category in which the New Jersey Supreme Court has placed it, a later Vermont case, *Boisvert v. Harrington,* 173 Vt. 285, 796 A.2d 1102 (2002), which, although involving an effort to revoke the granting of a motion to terminate guardianship and decided under Vermont case law in respect to such revocations, contains language that may be consistent with the minority category. The court said:

"Moreover, the parental preference doctrine is only that—a preference—an advantage given to parents over other persons. It does not answer the question of what is in the child's best interests.

---

22. *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983).

'The day is long past in this State, if it had ever been, when the right of a parent to the custody of his or her child, *where the extraordinary circumstances are present,* would be enforced inexorably, contrary to the best interest of the child, on the theory solely of an absolute legal right. Instead, *in the extraordinary circumstance,* when there is a conflict, the best interest of the child has always been regarded as superior to the right of parental custody. Indeed, analysis of the cases reveals a shifting of emphasis rather than a remaking of substance. This shifting reflects more the modern principle that a child is a person, and not a subperson over whom the parent has an absolute possessory interest.' "

*Boisvert,* 173 Vt. at 291, 796 A.2d at 1107–08 (emphasis added).

To the extent Vermont requires extraordinary circumstances before best interests are considered it belongs to the majority category; to the extent it does not, it is consistent with the minority view. We place it in the middle—the hybrid view.

The natural mother in the case of *In re Juvenile Appeal (Anonymous) v. Commissioner of Children and Youth Services,* 177 Conn. 648, 420 A.2d 875 (1979),[23] was to an extent suffering physical and emotional (depression) problems evolving from attempting to parent the child while at the same time earning a living for her family. Her husband was paralyzed from an accident and could not work and the mother was trying to avoid going on welfare. While receiving treatment she was involuntarily committed to a state hospital and later she was committed to another treatment center. She spent approximately four months in the two institutions. While she was committed, her child was cared for first by a baby-sitter, and ultimately was adjudicated an "uncared for" child and ·

---

**23.** This case is really not in the class of third-party cases that concern us in the case *sub judice.* It is a case between the natural parent and the State, although the State seeks to place the child for adoption with a third party. We include it here as an example of the confusing aspects of the "best interests" standard in cases other than those between natural parents.

placed with the Commissioner of Children and Youth Services, which in turn, placed the child with the same baby sitter for care.

Later, after sufficient recovery, the mother began efforts to regain custody of her child by filing suit against the Commissioner. Thereafter, the appropriate authorities determined that she was then fit to be a parent. Nonetheless, after further skirmishes, the Commissioner filed a separate petition to terminate her parental rights. Accordingly, this opinion is not a pure third-party case in that the state was the petitioning party.

In spite of the Maine (she had undergone recovery at her parent's house in Maine) authorities confirming that she was fit, the trial court ultimately denied the natural mother's petition for revocation, terminated her parental rights and designated the Commissioner as a statutory parent for the purpose of placing the child for adoption with the babysitter and her husband. In its opinion the Supreme Court of Connecticut stated that it was the position of the Commissioner that the department "disputed and still disputes, however, that return of the child to her mother was or is in the child's best interests because of the intervening attachment that formed between the child and her foster family during her mother's illness." *Id.* at 657, 420 A.2d at 880. The trial court had found for the Commissioner on that basis. In respect to the revocation of the child's commitment to the Commissioner, the court noted the statutory requirements and stated:

> "While it is certainly true ... that parents have no natural right to the custody of their children that can prevail over a disposition effecting the child's best interests, parents are entitled to the presumption, absent a continuing cause for commitment, that revocation will be in the child's best interest unless the state can prove otherwise.
>
> . . .
>
> "We must reject the claim of so-called 'parental rights' theory under which 'the parent has rights superior to all others except when he is proved unfit.' "

*Id.* at 659–61, 420 A.2d at 881–82. The Connecticut Supreme Court then cited to several United States Supreme Court cases, including *Stanley, supra,* and in language that appears to contradict the earlier language noted:

> "The termination of parental rights is defined as 'the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent.' It is 'a most serious and sensitive judicial action. Although that ultimate interference by the state in the parent-child relationship may be required under certain circumstances, the natural rights of parents in their children "undeniably warrants deference and, absent a powerful countervailing interest, protection."'

> "In contrast to custody proceedings [presumably between natural parents], in which the best interests of the child are always the paramount consideration and in fact usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings begun."

*Juvenile Appeal,* 177 Conn. at 671–72, 420 A.2d at 886 (alteration added) (citations omitted).

The Supreme Court of Nebraska has propounded a series of cases in which the standard approved is sometimes unclear.[24] *Gomez v. Savage,* 254 Neb. 836, 580 N.W.2d 523 (1998), was a case in which third parties were attempting to adopt two children over the natural father's objection and over the objection of the natural mother who was attempting to revoke her consent to the adoption. When she had consented to the adoption she lied when she stated that she did not know who the father was and thus the natural father, Gomez, neither received notice nor consented to the adoption. The natural parents, although not married, had sporadically lived together and during those periods the natural father had partly sup-

---

**24.** The Supreme Court of New Jersey in *Watkins, supra,* places Nebraska in the majority category. There is perhaps, in the cases discussed, sufficient language to place it into that category. We include it as a hybrid case because some of the language is unclear.

ported the child. The natural father had married another woman by the time of the proceeding. *Id.* at 848, 580 N.W.2d at 533.

The children were subsequently placed with the Savages. Gomez contested the adoption by filing a petition for a writ of habeas corpus for the return of his children. In the action "Gomez conceded that if he were found to be unfit [to have custody] it was in the best interests of the children that they remain [ ] [in the custody of] the Savages." *Id.* at 852, 580 N.W.2d at 535 (alterations added). The trial court found him to be unfit. The appellate court opined, almost in conflicting terms:

> "Where the custody of a minor child is involved in a habeas corpus action, the custody . . . *is to be determined by the best interests of the child,* with due regard for the *superior rights* of a fit, proper, and suitable parent.
>
> "A court may not properly deprive a parent of the custody of a minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the relationship, or has forfeited that right.
>
> "The right of a parent to the custody of a minor child is not lightly to be set aside in favor of more distant relatives or unrelated parties, and a court may not deprive a parent of such custody unless he or she is shown to be unfit or to have forfeited his or her superior right to such custody.
>
> . . .
>
> "[A]nd the State is not required to show harm to the children before parental rights can be terminated.
>
> . . .
>
> "Having determined that Gomez is unfit, we find . . . [that] it is in the best interests of the children to remain in custody of the Savages."

*Id.* at 848–52, 580 N.W.2d at 533–34 (alterations added) (citations omitted) (emphasis added). *See also Uhing v. Uhing,* 241 Neb. 368, 373–74, 488 N.W.2d 366, 370–71 (1992) ("[a]l-

though ... the 'question present in every habeas corpus case is the best interests of the child,' we cannot overlook or disregard that the 'best interests' standard is *subject* to the overriding recognition that 'the relationship between parent and child is constitutionally protected[.]' ... The courts may not properly deprive a parent of the custody of a minor child unless it is affirmatively shown that such parent is unfit ... or has forfeited that right") (citations omitted) (emphasis added). There are several other Nebraska cases which contain similar language, or merely find the natural parent unfit and go from there based upon the "best interests" standard. In some cases the state is involved in the process and thus, at least technically, they are not pure third-party cases.

Three other states, through their intermediate appellate courts, have rendered opinions that allow us to place them in the hybrid category of cases. In *In re Custody of Shields,* 120 Wash.App. 108, 120–23, 84 P.3d 905, 911–12 (2004), a post-*Troxel* case, the intermediate court, in a stepparent/natural parent custody dispute, attempted to apply a standard it had created prior to *Troxel* to the post-*Troxel* case. The court stated:

"Prior to 1987, parent and nonparent custody actions were governed by [a specific Washington statute], which required courts to determine custody based on the best interests of the child. However, courts determining nonparent custody cases were reluctant to apply the best interests standard when determining custody as between a parent and a nonparent. *See In re Marriage of Allen,* 28 Wash.App. 637, 626 P.2d 16 (1981).

"The *Allen* court concluded that courts determining custody between a parent and nonparent must apply a more stringent balancing test to protect both the parents' constitutional rights to privacy and the family entity. *Allen* held that the state may interfere with the parents' constitutional rights only if (1) the parent was unfit, or (2) 'the child's growth and development would be detrimentally affected by placement with an otherwise fit parent.' Significantly, the *Allen* court proposed the detriment to the child standard as

a 'middle ground' requiring a showing more than best interests, but less than parental unfitness.

. . .

"In summary, we reaffirm our agreement with *Allen* . . . . Nevertheless the requisite showing under *Allen* is substantial. While the detriment standard does not require a showing of parental unfitness, it does require a showing of actual detriment to the child's growth and development." [Alteration added.] [Some citations omitted.]

*See also In re Custody of S.H.B.,* 118 Wash.App. 71, 74 P.3d 674 (2003), a contest for custody between two third parties (the paternal and maternal grandparents); *In re Marriage of Allen,* 28 Wash.App. 637, 626 P.2d 16 (1981); *In re Welfare of Schulz,* 17 Wash.App. 134, 561 P.2d 1122 (1977) (a termination case in which the court rejected grandparents' claim to custody).

An intermediate appellate court in Missouri in the case of *M.P.M. v. Williams,* 611 S.W.2d 274 (Mo.App.1980), determined that the natural father was entitled to custody over the claim of a stepfather. The court found both fathers to be fit. It stated: "It is well established that the parent has the superior right to the custody of his or her minor children as against third persons. This right will not be denied . . . unless it is established that the parent is an unfit person or is unable to care properly for the minor children." *Id.* at 277–78 (citations omitted). *See also In re Marriage of Campbell,* 685 S.W.2d 280 (Mo.App.1985), where a different Missouri intermediate appellate court found a father unfit and awarded custody to a third party stating the same standard as *M.P.M.*

In *Chavez v. Chavez,* 148 S.W.3d 449 (Tex.App.2004), a Texas intermediate appellate court, in a case where a third-party grandparent intervened in a divorce case seeking to have a conservatorship created in respect to the children of the marriage, stated:

"For the court to award managing conservatorship to a non-parent . . . the non-parent must prove . . . that appoint-

ing the parent as a managing conservator would result in serious physical or emotional harm to the child. There must be evidence to support the logical inference that some specific, identifiable behavior or conduct of the parent will probably cause that harm. "Further, it is wholly inadequate to simply present evidence that a non-parent would be a better choice as custodian of the child.

. . .

"Thus, the grandparents here had to establish either (1) it was not in the children's best interest for Liliana to be appointed as a managing conservator *because* it would significantly impair the children's physical health or emotional development; or (2) Liliana voluntarily relinquished actual care, control, and possession of the children to the grandparents for a least one year . . . . "

*Id.* at 458–59 (citations omitted) (emphasis added).

There are several intermediate appellate decisions from various California courts in which a California visitation statute was challenged on constitutional grounds. At least one of the appellate circuits has held the statute constitutional, but that case notes that "at least four California appellate opinions have found section 3102 unconstitutional . . . ." *Fenn v. Sherriff,* 109 Cal.App.4th 1466, 1477, 1 Cal.Rptr.3d 185 (2003). The four opinions in which the statute was declared unconstitutional were from different appellate circuits. Our state may belong in either, or both, of the other categories. For that reason we have placed it with the hybrid states for the purposes of this opinion. All the language of the Maryland cases stress "best interest of the child" language, but often do so in a manner that can be construed, in respect to third-party disputes, as just another way of ascribing to the majority view. In other words, some language, sometimes in the same case, supports both views. All of the adoption cases seem to stress the "best interest" language, exclusively; as do, of course, the cases between natural parents and those between only third parties. Likewise, the language is used extensively where the State is involved in actions affecting the natural parents'

rights. While the same language is always used in third-party cases involving attempts to assert rights over natural parents, other language in some of those cases appears to support the majority position, albeit always including "best interest" language as well. For example, in one of our seminal cases involving third-party/natural parent contests, *Ross v. Hoffman*, 280 Md. 172, 175–79, 372 A.2d 582 (1977), we noted:

"The best interest standard controls when the dispute . . . is between his biological father and mother. It also controls when the dispute over custody is between a biological parent and a third party. . . . In parent-third party disputes, however, there is a twist to the application of the best interest standard.

"Nevertheless, there persists in this State in a contest over the custody of a child, but always subject to the best interest standard, that part of the common law concept which declares that the right of either parent is ordinarily superior to that of anyone else. . . . In *Ross v. Pick, supra*, 199 Md. [341] at 351[, 86 A.2d 463 (1952)], we set out this principle in the form of a presumption. . . . In *Ross v. Pick, supra*, 199 Md. at 351, 86 A.2d 463, we pointed out that the ordinary entitlement of parents to the custody of their minor children . . . is not an absolute one and declared that the right 'may be forfeited where it appears that any parent is unfit to have custody of a child, or where some exceptional circumstances render such custody detrimental to the best interests of the child.'

"To recapitulate: the best interest of the child standard is always determinative in child custody disputes. When the dispute is between a biological parent and a third party, it is presumed that the child's best interest is subserved by custody in the parent. That presumption is overcome and such custody will be denied if (a) the parent is unfit to have custody, or (b) if there are such exceptional circumstances as make such custody detrimental to the best interest of the child. *Therefore, in parent-third party disputes over custody, it is **only** upon a determination by the equity court that the parent is unfit or that there are exceptional circum-*

*stances which make custody in the parent detrimental to the best interest of the child, **that the court need inquire into the best interest of the child in order to make a proper custodial disposition.***"[25] [Bolding added.] [Citations omitted.] [Emphasis added.]

The language of *Hoffman* that we have emphasized and bolded, when compared with the rest of the language as to the "best interest" standard appears to create a conundrum of sorts. If the custody is always to be ultimately determined by what is in the "best interests" of the child then the parents' fitness or extraordinary circumstances have no place in the discussion. In our view, the "best interest" language of *Hoffman,* with the presumptions and conditions attached to it, can be interpreted as consistent with the majority view, *i.e.,* in third-party cases there must first be a finding of parental unfitness or extraordinary circumstances before custody can be transferred to a third party based on a "best interest" analysis.

Numerous of this state's appellate cases since *Hoffman,* if not all of them, can be traced back to that case. For instance, the *Ross v. Hoffman* language was discussed extensively in the Court of Special Appeals case of *Lipiano v. Lipiano,* 89 Md.App. 571, 577–78, 598 A.2d 854, 857 (1991), where that court stated:

"The principles governing the judicial resolution of child custody disputes between biological parents and other persons were set forth in *Ross* .... Summarizing its several conclusions, the Court there held, at 178–79[, 372 A.2d 582]:

'To recapitulate: the best interest of the child standard is always determinative in child custody disputes [here that court quotes the same language from *Ross* we have quoted above].'

"The language used by the *Ross* Court is clear and precise. It does not envisage there being degrees of third

---

**25.** In *Shurupoff, supra,* we included language that appears to reject the last phrase in *Hoffman.* It is that language in *Shurupoff* that might be construed to place Maryland in the minority category.

parties—'natural' parents who are not biological parents, 'equitable' parents, and others. Certainly, the closeness of the relationship between the child and the non-biological parent is of considerable importance, but that importance relates to whether there are exceptional circumstances which would make an award of custody to the biological parent detrimental to the best interest of the child." [Alteration added.]

In a true "best interest" jurisdiction, the standard would be applied directly to the child as it is in the minority jurisdictions, such as Pennsylvania, Colorado, perhaps Oregon and other states. *Hoffman* has been extensively cited throughout our most recent case of *Shurupoff v. Vockroth,* 372 Md. 639, 814 A.2d 543 (2003), in which we quote most of the above language from *Hoffman.* We also stated in that case, addressing evidentiary standard issues, but also noting the language problem we have previously discussed, that:

"To some extent, these differences may account for some of the language used by the courts in describing the standard of proof applicable in those cases. Maryland law is somewhat ambiguous. On the one hand, Maryland Code, § 5–203(a)(2) of the Family Law Article, provides that a parent is the sole *natural* guardian of his or her minor child if the other parent dies, abandons the family, or is incapable of acting as parent. On the other, we have not viewed custody disputes between a surviving parent and a third party as in the nature of legal guardianship proceedings, but, subject to the *Ross v. Hoffman* analysis, as like any other custody case.

"Some States, as petitioner notes, have, indeed, adopted a clear and convincing evidence standard in parent/third party custody cases (or in cases that the court found equivalent to a custody dispute). Other States have adopted that standard in cases . . . upon rationales that are inconsistent with the Maryland experience and approach. . . .

"We are aware of no case in which a State Supreme Court has concluded that the clear and convincing evidence stan-

dard is required in pure custody disputes between a parent and third party as a matter of Constitutional law. . . .

"We do not regard an order granting custody of a child to a third party, subject to modification and with appropriate visitation privileges reserved to the parent, as the equivalent of terminating parental rights . . . ."

*Shurupoff,* 372 Md. at 655–57, 814 A.2d at 553–54 (citations omitted).

At the conclusion of the *Shurupoff* opinion, we announced an interpretation of *Hoffman's* main holding by stating that we, in *Hoffman,* "should have stopped there. Instead, we continued, in the very next sentence: . . ." and we proceeded to describe the qualifying language from *Hoffman.* Our *Shurupoff* opinion stated:

"Having first announced that the best interest of the child 'is always determinative in child custody disputes,' we did muddy the waters a bit by stating that, unless the trial court finds unfitness or exceptional circumstances that would make custody in the parent detrimental to the child's best interest, it need not 'inquire into the best interest of the child in order to make a proper custodial disposition.' "

*Shurupoff,* 372 Md. at 661–62, 814 A.2d at 557.

We then continued by stating, without overruling the language from *Hoffman,* that "[t]he court must always, necessarily, inquire into what is in the child's best interest, for that is the ultimate, determinative factor." *Shurupoff,* 372 Md. at 662, 814 A.2d at 557. With that additional language, if it stands, Maryland has gone from, questionably, the majority view in this country as to private third-party custody actions to clearly the minority view. That was not the intention of the Court.

■ We shall hold, as we indicated in the beginning of our opinion, that, generally, in private actions in which private third parties are attempting to gain custody of children of natural parents over the objection of the natural parents, it is necessary first to prove that the parent is unfit or that there are extraordinary circumstances posing serious detriment to

the child, before the court may apply a "best interest" standard. With this clarification, Maryland will be consistent with the majority view in this country.

It appears, as we now view it, that the original qualifying language in *Hoffman* as to third-party cases, is closer to, although not squarely within, the majority view than to the minority view.

### 3. Majority View

We now discuss the majority view, *i.e.*, because of the presumption that natural parents are fit to raise their children and/or because natural parents have a fundamental constitutional right to raise their children, or both, there must first be a finding that the natural parents are unfit, or extraordinary circumstances detrimental to the welfare of the child must first be determined to exist, before the "best interest of the child" test may be applied when private third-parties dispute custody with natural parents. The majority view, in one manifestation or another, prevails in at least the following states: New Jersey, Iowa, Ohio, New York, Wisconsin, Nevada, Arkansas, Maine, Alaska, Kansas, South Dakota, North Dakota, Tennessee, Oklahoma, Montana, New Mexico, North Carolina, South Carolina, Alabama, Kentucky, Rhode Island, Massachusetts, Minnesota, Mississippi, Georgia, Virginia, Florida, Indiana, Utah, probably Idaho, and until, arguably, recently, Maryland. The Supreme Court of New Jersey would also place Arizona, Missouri, California, Washington and New Hampshire in the majority category. With the case *sub judice*, Maryland returns to the majority category.[26]

Because it has furnished a comprehensive view of the case law on the issue of the rights of natural parents *vis-à-vis* third parties, we shall commence this discussion with a relatively recent case from the Supreme Court of New Jersey, *Watkins*

---

**26.** Because of some of the language found in some cases, we have not placed them in the majority category, and have placed some of them in the hybrid category, although they appear to be closer to the majority view than the minority view.

*v. Nelson,* 163 N.J. 235, 248–53, 748 A.2d 558, 565–68 (2000). There the court discussed the varying views:

"The standard that we articulate today has been applied, either in whole or in part, in most jurisdictions that have been confronted with the issue. Like this Court, they have created a presumption in favor of a parent that may be rebutted by proof of parental unfitness, neglect, or 'exceptional circumstances.' *See, e.g., C.G. v. C.G.,* 594 So.2d 147, 149 (Ala.Civ.App.1991) (quoting *McLendon v. McLendon,* 455 So.2d 861, 862 (Ala.Civ.App.1984)[27]) (requiring 'clear and convincing evidence that the parent is unfit or unsuited for custody and that the best interest of the child will be served by granting custody to the third person'); *Maricopa County Juvenile Action No. JD–05401,* 173 Ariz. 634, 845 P.2d 1129, 1136 (Ariz.App.1993) (stating parental presumption can only be overcome by stringent standard requiring showing of unfitness or neglect); *In re Guardianship of D.A. McW,* 460 So.2d 368, 370 (Fla.1984) (stating parental presumption can be rebutted only if 'detrimental to the welfare of the child' based on an exceptional circumstances test); *Carvalho v. Lewis,* 247 Ga. 94, 274 S.E.2d 471, 472 (1981) (applying unfitness or 'compelling circumstances' test and noting '[a] court is not allowed to terminate a parent's natural right because it has determined that the child might have better financial, educational, or even moral advantages elsewhere'); *Stockwell v. Stockwell,* 116 Idaho 297, 775 P.2d 611, 613 (1989) (requiring unfitness, abandonment, or that 'the child has been in the nonparent's custody for an appreciable period of time'); *In re Kirchner,* 164 Ill.2d 468, 208 Ill.Dec. 268, 649 N.E.2d 324, 334–35, 339 (1995) (stating nonparent only has standing to petition for custody of child if parent voluntarily and indefinitely relinquished custody,

---

**27.** In *McLendon v. McLendon,* 455 So.2d 863, 866 (Ala.1984), the Supreme Court of Alabama reversed the decision of the Alabama intermediate appellate court on narrow grounds regarding prior grants of custody. Since *McLendon,* 455 So.2d 863, the Supreme Court of Alabama has squarely placed that state in the majority. *See Ex parte N.L.R.,* 863 So.2d 1066 (Ala.2003), discussed *infra.*

or upon a finding of unfitness); *In re Guardianship of Williams*, 254 Kan. 814, 869 P.2d 661, 669 (1994) (requiring unfitness, neglect, or highly unusual or extraordinary circumstances 'even though the trial court might feel that it would decide otherwise if free to consider only the "best interests" apart from the benefits to be derived from the love and care of the natural parent'); *Davis v. Collinsworth*, 771 S.W.2d 329, 330 (Ky.1989) (requiring unfitness or abandonment and noting that failure to provide essential care only qualifies when based on reasons other than poverty alone); *Sider v. Sider*, 334 Md. 512, 639 A.2d 1076, 1086 (1994) (requiring unfitness or exceptional circumstances); *White v. Thompson*, 569 So.2d 1181, 1183–84 (Miss.1990) (requiring abandonment, unfitness, or immorality); *Cotton v. Wise*, 977 S.W.2d 263, 264 (Mo.1998) (requiring unfitness, abandonment, or 'extraordinary circumstances'); *In re Guardianship of K.M.*, 280 Mont. 256, 929 P.2d 870, 873 (1996) (requiring voluntary relinquishment); *Henderson v. Henderson*, 174 Mont. 1, 568 P.2d 177, 181 (1977) (requiring unfitness, neglect, or delinquency); *Locklin v. Duka*, 112 Nev. 1489, 929 P.2d 930, 933 (1996) (requiring unfitness or extraordinary circumstances); *In re Adoption of J.J.B.*, 119 N.M. 638, 894 P.2d 994, 1008 (1995) (requiring unfitness or extraordinary circumstances); *Merritt v. Way*, 58 N.Y.2d 850, 460 N.Y.S.2d 20, 446 N.E.2d 776, 777 (1983) (requiring surrender, abandonment, unfitness, persistent neglect, or other extraordinary circumstances); *In re Woodell*, 253 N.C. 420, 117 S.E.2d 4, 7 (1960) (quoting *James v. Pretlow*, 242 N.C. 102, 86 S.E.2d 759, 761 (1955)) (stating natural parent has right to child which may only be interfered with 'for the most substantial and sufficient reasons and . . . only when the interests and welfare of the children clearly require it'); *In re E.J.H.*, 546 N.W.2d 361, 364 (N.D.1996) (requiring a finding of exceptional circumstances 'to trigger a best-interest analysis'); *In re Guardianship of M.R.S.*, 960 P.2d 357, 361–62 (Okla.1998) (quoting *Alford v. Thomas*, 316 P.2d 188 (Okla.1957)) (requiring unfitness or 'circumstances of great weight and importance connected with the

necessary welfare of the child); *Ryan v. DeMello,* 116 R.I. 264, 354 A.2d 734, 735 (1976) (stating 'the Family Court may award the custody of a child to a relative ... if there has been a judicial determination that the child is delinquent, wayward, neglected, or otherwise comes within the purview of the Family Court Act'); *Moore v. Moore,* 300 S.C. 75, 386 S.E.2d 456, 458 (1989) (requiring unfitness unless parent temporarily relinquishes custody and then extraordinary circumstances); *D.G. v. D.M.K.,* 557 N.W.2d 235, 243 (S.D. 1996) (requiring gross misconduct, unfitness, or 'extraordinary circumstances' beyond 'a simple showing' of best interests); *In re Adoption of Female Child,* 896 S.W.2d 546, 548 (Tenn.1995) (stating parent cannot be deprived of custody unless there has been a finding of substantial harm to the child); *Bailes v. Sours,* 231 Va. 96, 340 S.E.2d 824, 827 (1986) (quoting *Wilkerson v. Wilkerson,* 214 Va. 395, 200 S.E.2d 581, 583 (1973) (requiring unfitness, abandonment, voluntary relinquishment or ' "special facts and circumstances ... constituting an extraordinary reason for taking a child from [a] parent" ')); *In re S.B.L.,* 150 Vt. 294, 553 A.2d 1078, 1082 (1988) (requiring unfitness or extraordinary circumstances); *Snyder v. Scheerer,* 190 W.Va. 64, 436 S.E.2d 299, 304 (1993) (requiring unfitness, neglect, abandonment or waiver).

"Four states rely on harm to the child, which is part of the 'exceptional circumstances' exception. *See, e.g., Carter v. Novotny,* 779 P.2d 1195, 1197 (Alaska 1989) (requiring unfitness or that parental custody would be 'clearly detrimental to the child.'); *Nancy S. v. Michele G.,* 228 Cal. App.3d 831, 279 Cal.Rptr. 212, 214–15 (1991) (requiring a showing that 'award of custody to a parent would be detrimental to the child'); *Hutchison v. Hutchison,* 649 P.2d 38, 41 (Utah 1982) (requiring unfitness or 'that no strong mutual bond exists, that the parent has not demonstrated a willingness to sacrifice his or her own interest and welfare for the child's, and that the parent lacks the sympathy for and understanding of the child that is characteristic of parents generally'); *In re Marriage of Allen,* 28 Wash.App.

637, 626 P.2d 16, 23 (1981) (holding that something more than the 'best interests of the child' is required to show 'actual detriment to the child,' but not requiring unfitness).

"A small minority of jurisdictions apply a hybrid of the child's best interest test and the 'exceptional circumstances' exception. *See, e.g., Freshour v. West,* 334 Ark. 100, 971 S.W.2d 263, 266 (1998) (recognizing preference for parent, but noting child's best interest is controlling); *Durkin v. Hinich,* 442 N.W.2d 148, 153 (Minn.1989) (noting presumption exists unless parent is unfit or 'grave and weighty' reasons exist that 'custody otherwise would not be in the best welfare and interest of the child'); *Stanley D. v. Deborah D.,* 124 N.H. 138, 467 A.2d 249, 251 (1983) (recognizing parental presumption, but making ultimate determination depend on child's best interests); *Charles v. Stehlik,* 560 Pa. 334, 744 A.2d 1255, 1257 (2000) (same); *In re Kosmicki,* 468 P.2d 818, 823 (Wyo.1970) (requiring unfitness or best interest of child, but 'in proceedings involving children of tender years it is only in very exceptional circumstances that a mother should be deprived of the care and custody of her children').

"One reason the overwhelming majority of states do not apply simply the child's best interests standard, or the ubiquitous, amorphous standard urged by the dissenters, is fear 'that if taken to its logical conclusion, application of [that] standard "could lead to a redistribution of the entire minor population among the worthier members of the community." ' Vanessa L. Warzynski, *Termination of Parental Rights: The 'Psychological Parent' Standard,* 39 Vill. L.Rev. 737, 759 (1994) (quoting Helen Simpson, *The Unfit Parent: Conditions Under Which a Child May Be Adopted Without the Consent of His Parents,* 39 O. Det. L.Rev. 347, 355 (1962)). We have applied the parental preference to avoid 'the danger of giving courts the power to award custody . . . to [nonparents] solely on the grounds of best interests. If [that] is the only criterion, then a judge may take children from their parents because the judge personally [disapproves of] the parents' limited means.' *Turner v.*

*Pannick,* 540 P.2d 1051, 1054 (Alaska 1975)[28] (citing with approval *In re B.G.,* 11 Cal.3d 679, 114 Cal.Rptr. 444, 523 P.2d 244 (1974)).

"The standard we adopt today is designed to reduce or minimize judicial opportunity to engage in social engineering in custody cases involving third parties. In contrast, under the standard urged by Justice Stein, custody would be awarded to a third party if the child's growth and development would be 'detrimentally affected' by placement with a parent. *Post* at 290, 748 A.2d at 589 (Stein, J., dissenting). It appears that he is urging a camouflaged child's best interest standard. The use of such a standard to decide custody disputes between a fit parent and a third party will evolve into a 'fitness contest' whose outcome will depend on the whims of the trial court. Application of Justice Stein's 'detrimentally affected' standard to this case reveals only that it might be detrimental to Chantel to be raised by Larry when compared to the Nelsons. He then concludes that the Nelsons might possibly be better parents than Larry. The danger inherent in that approach is that it permits reallocation of children by the judiciary—a system that would undoubtedly victimize poor people. *See* Carolyn Curtis, *The Psychological Parent Doctrine in Custody Disputes Between Foster Parents and Biological Parents,* 16 Colum. J.L. & Soc. Probs., 149, 155 (1980). The standard that we adopt has as its benchmark the welfare of the child while at the same time protecting parental rights."

The New Jersey court then stated the majority view, holding:

"To recapitulate, it is the relationship of the child to the person seeking custody that determines the standard to be used in deciding the custody dispute. When the dispute is between two fit parents, the best interest of the child standard controls. . . . But, when the dispute is between a fit parent and a third party, only the fit parent is presumed to

---

**28.** This case was discussed in *Evans v. McTaggart,* 88 P.3d 1078 (Alaska 2004), which we address *infra.*

be entitled to custody.... Viewed in that context, in custody determinations between a fit parent and a third party, as opposed to claims made between two fit parents, the child's best interests become a factor *only after the parental termination standard has been met, rather than the determinative standard itself.*

"The standard that controls a custody dispute between a third party and a parent involves a two-step analysis. The first step requires application of the parental termination standard[29] or a finding of 'exceptional circumstances.'

"If either the statutory parental termination standard or the 'exceptional circumstances' prong is satisfied, the second step requires the court to decide whether awarding custody to the third party would promote the best interests of the child.... That said, the point to be emphasized is that the best interest of the child cannot validly ground an award of custody to a third party over the objection of a fit parent without an initial court finding that the standard for termination of the rights of a non-consenting parent or the 'exceptional circumstances' prong has been satisfied. Any contrary expressions in reported decisions are disapproved."

*Watkins,* 163 N.J. at 253–55, 748 A.2d at 568–69 (footnotes added) (some emphasis added). *See also P.B. v. T.H.,* 370 N.J.Super. 586, 598, 851 A.2d 780, 787 (App.Div.2004) ("Unless the neighbor can first establish psychological parent status ... the best interests test is never reached. Strangers may not compete with fit parents on the basis that they might be a 'better' parent."); *Zack v. Fiebert,* 235 N.J.Super. 424, 563 A.2d 58 (App.Div.1989).

In the third party case of *In re Marriage of Halvorsen,* 521 N.W.2d 725 (Iowa 1994), a stepparent was attempting to gain custody over a child from the natural mother during a divorce case. The Supreme Court of Iowa, held for the natural mother, opining:

---

**29.** Language in the case indicates that the parental termination standard in New Jersey requires a natural parent to be " 'grossly immoral or unfit."

"If Bob is considered to be a biological parent, we would apply the best interests of the child standard [the standard in contests between natural parents] . . . rather than using the more difficult burden of proof required to grant custody to a nonparent over a parent.

. . .

"A court may only grant a nonparent custody of a child over a parent when the nonparent proves that the parent . . . is not suitable to have custody. We have observed on more than one occasion that '[c]ourts are not free to take children from parents simply by deciding another home offers more advantages.'

"Bob is not the biological parent of [the child]. Therefore, he is a nonparent. . . . To succeed he must prove that [the natural mother] is an unsuitable custodian for [the child]."

*Id.* at 728–29 (alterations added) (citations omitted).

The Court of Appeals of New York, in a succinct opinion in the case of *In the Matter of Merritt v. Way,* 58 N.Y.2d 850, 853, 460 N.Y.S.2d 20, 446 N.E.2d 776, 777 (1983), summarized the law in that state: "In a custody contest between parent and nonparent, the question of best interests is not reached absent a showing of surrender, abandonment, unfitness, persistent neglect or other extraordinary circumstance" (citation omitted). New York's lower courts still adhere to the *Merritt* majority view. *See Sean H. v. Leila H.,* 5 Misc.3d 315, 783 N.Y.S.2d 785 (Sup.Ct.2004) ("The state may not deprive a parent of the custody of a child absent 'surrender, abandonment, persistent neglect, unfitness or other like, extraordinary circumstances.'" *See also Campbell v. Brewster,* 9 A.D.3d 620, 779 N.Y.S.2d 665, 666 (2004) ("Only if such extraordinary circumstances are proven will the court examine the best interests of the child") (citation omitted); *In the Matter of Rudy v. Mazzetti,* 5 A.D.3d 777, 774 N.Y.S.2d 171, 172 (2004) ("Once there is a finding of extraordinary circumstances, a best interests determination *is triggered* ") (citations omitted)

(emphasis added); *In the Matter of Vann v. Herson,* 2 A.D.3d 910, 912, 768 N.Y.S.2d 44, 46 (2003) ("In the event the threshold of extraordinary circumstances is satisfied, a court then proceeds to determine custody through application of the best interest standard") (citations omitted). Several other intermediate appellate court holdings in New York are consistent with *Merritt.*

The Maine case of *Rideout v. Riendeau,* 761 A.2d 291 (Me.2000) involved the issue of the constitutionality of Maine's "Grandparents Visitation Act" in light of the *Troxel* decision of the Supreme Court finding that the Washington third party visitation act was unconstitutional. The Maine court found its statute to be constitutional because it was sufficiently narrowly tailored to meet a compelling state interest. In the process it noted:

> "The *Troxel* opinion does, however, provide us with clear guidance on important points. First,
>
>> 'The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this court.'
>
> The fundamental right of parents to direct the care and upbringing of their children does not disappear in the face of a third party's request for visitation with the children. *Second, the best interests of the child standard, standing alone, is an insufficient standard for determining when the state may intervene in the decision making of competent parents.* And finally, because of the 'presumption that fit parents act in the best interests of their children,' trial courts must accord special weight to parents' decisions and objections regarding requests for third-party visitation.
>
> . . .
>
> " 'Accordingly, so long as a parent adequately cares for his or her children (*i.e.,* is fit), there will *normally* be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make

the best decisions concerning the rearing of that parent's children.'

. . .

"We agree with the trial court, however, that something more than the best interest of the child must be at stake in order to establish a compelling state interest.

. . .

"The State, therefore, has an urgent, or compelling, interest in providing a forum for those grandparents having such a 'sufficient existing relationship' with their grandchildren.

. . .

"The court may not simply consider the best interest of the child, but must also consider and give significant weight to the parents' position, thus preventing the court from intervening in a fit parent's decision making *simply on a best interests basis.*

"Again, the court must focus its attention, not solely on the determination of the best interests of the child, but also on how the visitation would affect the parent's relationship with that child. If the court determines that visits with a grandparent will significantly interfere with the parent-child relationship, that determination precludes any further intrusion into the parent's decision."

*Id.* at 297–303 (citations omitted) (emphasis added) (footnote omitted).

*In Barstad v. Frazier,* 118 Wis.2d 549, 551, 553–54, 568, 348 N.W.2d 479, 482–83, 489 (1984), a third-party custody dispute, the Supreme Court of Wisconsin stated:

"In its findings of fact and conclusions of law, the circuit court stated that it was applying the best interests of the child criteria but also stated that there were compelling reasons for not awarding custody of Michael to his mother. We conclude that the 'best interests of the child' is not the proper standard in custody disputes between a natural

parent and a third party and also that the record does not support a conclusion of compelling reasons for denying custody to Michael's mother.

. . .

"Other jurisdictions have had occasion to analyze the legal and social forces at work when courts have been called upon to steer the frail bark of a child's 'best interest' through the cross-currents of parent-grandparent relationships, where the whirlpools of love and attachment may pull powerfully in opposite directions.

"When a parent is young, the physical, financial and even emotional factors may often appear to favor the grandparents. One cannot expect young parents to compete on an equal level with their established older relatives. So the 'best interest' standard cannot be the test. If it were we would be forced to conclude that only the more affluent in our society should raise children. *To state the proposition is to demonstrate its absurdity.*

. . .

"We conclude that the rule to be followed in custody disputes between parents and third parties is that a parent is entitled to custody of his or her children unless the parent is either unfit or unable to care for the children or there are compelling reasons for awarding custody to a third party. Compelling reasons include abandonment, persistent neglect of parental responsibilities, extended disruption of parental custody, or other similar extraordinary circumstances that would drastically affect the welfare of the child. *If the court finds such compelling reasons,* it may award custody to a third party if the best interests of the children would be promoted thereby." [Citation omitted.] [Emphasis added.] [Footnote omitted.]

*See also Howard M. v. Jean R.,* 196 Wis.2d.16, 539 N.W.2d 104 (1995).

In *Schuh v. Roberson,* 302 Ark. 305, 306, 788 S.W.2d 740, 741 (1990), the Supreme Court of Arkansas reviewed a case in

which the trial court had granted custody to a third party, a grandparent who had intervened in a divorce action and in a later paternity action, over a parent's objection. The court noted that the natural parent was claiming that she had not been found unfit and accordingly the trial court should not have granted custody to the grandparent. The court opined noting that, "when a third person seeks to deprive a parent of custody, she cannot do so without *first* proving that the parent is not a suitable person to have the child" (emphasis added). Later, in an opinion consistent with *Schuh*, in an intermediate appellate court case in which the state sought to terminate parental rights in favor of the grandparents, *Robbins v. State*, 80 Ark.App. 204, 208, 92 S.W.3d 707, 710 (2002),[30] that court opined, "As a general rule, there must be a finding of unfitness of the natural parents in order to give custody to a third party." A different Arkansas intermediate appellate court appears to have departed somewhat from the *Schuh* holding. In *Dunham v. Doyle*, 84 Ark.App. 36, 40, 129 S.W.3d 304, 307 (2003), the court stated, *inter alia* that, "While there is a preference in custody cases to award a child to its biological parent, that preference is not absolute. Rather, of prime concern, and the controlling factor, is the best interest of the child" (citation omitted). We presume the controlling law in Arkansas is its Supreme Court's *Schuh* opinion, albeit it is fifteen years old.

The Nevada high court opined, in at least two earlier cases, *Norris v. Graville*, 95 Nev. 71, 589 P.2d 1024 (1979) and *Cole v. Dawson*, 89 Nev. 14, 504 P.2d 1314 (1973) that, "the policy of this state is to award custody to a parent, in preference to a nonparent, unless the parent is found to be unfit." *Norris*, 95 Nev. at 73, 589 P.2d at 1025.[31]

---

**30.** Technically, this case is not a pure third-party case in that it originated *via* an action filed by the state based upon alleged child sexual abuse in the home of the natural parent.

**31.** In reference to the propriety of joint applications for custody by the natural parents and grandparents, the Nevada court said, "such [a

In two separate later cases the Supreme Court of Nevada, while apparently attempting to establish what constituted situations contrary to the welfare of the child, discussed a Nevada standard that appears to be its application of "extraordinary circumstances." First, in *Locklin v. Duka,* 112 Nev. 1489, 1495–96, 929 P.2d 930, 934 (1996), the court stated in reliance on opinions of other states, including Maryland's *Ross v. Hoffman, supra,* in regard to what constitutes "extraordinary circumstances," that, "[w]e therefore hold that in Nevada, extraordinary circumstances sufficient to overcome the parental preference presumption are those circumstances which result in serious detriment to the child." Then, apparently further protecting parental rights, that court held that even after the parental presumption has been rebutted by the showing of serious detriment to the welfare of the child, the court must then still go on to consider the "best interests of the child" before depriving a parent of custody: "We also conclude, consistent with the law in New York and Wisconsin, that when considering the two-part test . . . the best interests of the child must still be considered, even after a finding of extraordinary circumstances that overcome the parental preference presumption." *Locklin,* 112 Nev. at 1496, 929 P.2d at 935. The *Locklin* court focused only on what constituted "extraordinary circumstances" and left intact that state's parental fitness test that it had restated a few months prior in *Litz v. Bennum,* 111 Nev. 35, 888 P.2d 438 (1995):

"We conclude that the parental preference policy is a rebuttable presumption that must be overcome either by a showing that the parent is unfit or other extraordinary circumstances.

"The Bennums argue that *Fisher v. Fisher,* 99 Nev. 762, 670 P.2d 572 (1983), deemphasizes the parental preference doctrine.

---

joint] application is not against public policy if in the best interest of the child." *Cole,* 89 Nev. at 16, 504 P.2d at 1316. It is because of this language that some might place Nevada in the hybrid category of states rather than with the majority view.

"Therefore, the *Fisher* court did not change the fact that the parental preference doctrine is a presumption that must be overcome if the parent is fit. Instead, the *Fisher* court emphasized that when it clearly appears that the child's welfare requires a change of custody, then the natural parent presumption may be overcome. However, this court has made it clear that the 'best interests of the child is usually served by awarding his custody to a fit parent.'"

*Litz,* 111 Nev. at 38, 888 P.2d at 440 (some citations omitted).

The Supreme Court of Alabama recently placed that state clearly in the majority category when it stated in *Ex parte N.L.R,* 863 So.2d 1066, 1068–69 (Ala.2003):

"This Court recently stated the standard a trial court *must apply* in a custody dispute between a parent and a nonparent:

'This Court established the standard a trial court must apply in a custody dispute between a parent and a non parent:

"'The prima facie right of a natural parent to the custody of his or her child, as against the right of custody in a nonparent, is grounded on the common law concept that the primary parental right of custody is in the best interest and welfare of the child as a matter of law. *So strong is this presumption, absent a showing of voluntary forfeiture of that right, that it can be overcome only by a finding, supported by competent evidence, that the parent seeking custody is guilty of . . . misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.'"'

. . .

"Therefore, *before* the trial court could properly award custody to the maternal grandmother, the trial court had to find N.L.R 'unfit' to be entrusted with the custody of his children. However, the trial court instead found N.L.R. 'to be *fit* to have custody.' This finding clearly precluded, as a

matter of law, the award of custody to the maternal grandmother." [Citation omitted.] [Some emphasis added.]

In *Kay v. Rowland,* 285 S.C. 516, 517, 331 S.E.2d 781–82, 781 (1985), the Supreme Court of South Carolina, citing to *McDowell v. Richardson,* 279 S.C. 268, 305 S.E.2d 577 (1983), opined:

"In *McDowell,* we held it was error to award custody to a grandparent absent a finding that the natural parent was unfit. Thus, we recognized the superior rights of a natural parent in a custody dispute with a third party. Once the natural parent is deemed fit, the issue of custody is decided."

In *Hockstok v. Hockstok,* 98 Ohio St.3d 238, 242, 246, 247, 781 N.E.2d 971, 975, 979 (2002), the Supreme Court of Ohio addressed the pertinent issues in a paternity case. It first noted a statute that provided that if a court found that it was in the best interests of a child for neither natural parent to have custody, a court could give custody to a relative of the natural parents. The court nonetheless opined:

"Accordingly, we have held that in a child custody proceeding between a parent and nonparent, a court may not award custody to the nonparent 'without *first* determining that a preponderance of the evidence shows that the parent abandoned the child; contractually relinquished custody of the child; that the parent has become totally incapable of supporting or caring for the child; or that an award of custody to the parent would be detrimental to the child.' If a court concludes that any one of these circumstances describes the conduct of a parent, the parent may be adjudged unsuitable, and the state may infringe upon the fundamental parental liberty interest of child custody.

"Thus, a finding of parental unsuitability has been recognized by this court as a *necessary first step* in child custody proceedings between a natural parent and nonparent.

"In *In re Perales,*[32] we held that since the issue of custody in that case did not arise from a divorce proceeding but

---

**32.** *In re Perales,* 52 Ohio St.2d 89, 369 N.E.2d 1047 (1977).

rather from a dispute between a parent and a nonparent, the juvenile court erred in applying the best interest standard . . . .

"Such an outcome [requiring a hearing where a natural parent has a right to contest unfitness] is consistent with the jurisprudence of this court that in custody cases between a natural parent and nonparent, a parental unsuitability determination must be made and appear in the record before custody can be awarded to a nonparent.

. . .

"After such a determination has established, or taken away, a parent's fundamental custodial rights, the focus must shift from the rights of the parents to the rights of the child. A child's rights are effectuated through the use of the best-interest-of-the-child standard for *subsequent* custodial modification requests." [Alterations added.] [Citation omitted.] [Emphasis added.] [Footnote added.]

*See also Perales, supra; Masitto v. Masitto,* 22 Ohio St.3d 63, 488 N.E.2d 857 (1986). Ohio's intermediate appellate courts have opined similarly. *See In re Alyssa,* 153 Ohio App.3d 10, 790 N.E.2d 803 (2003); *In re Adoption of Mays,* 30 Ohio App.3d 195, 507 N.E.2d 453 (1986).

The Supreme Court of Alaska has addressed the issue in a case in which grandparents had intervened in a custody dispute between natural parents and were awarded custody over the objections of the natural parents. Much of the case concerns the evidentiary standards (preponderance or clear and convincing) that were applicable. That court also discussed the rule as to third-party custody in Alaska. In *Evans v. McTaggart,* 88 P.3d 1078, 1083, 1085 (Alaska 2004), the court stated:

"In *Turner v. Pannick* [33] the question was whether the 'welfare of the child' requirement . . . could be satisfied if the non-parent showed that the child's best interests would

___

33. *Turner v. Pannick,* 540 P.2d 1051 (Alaska 1975).

be served by awarding custody to the non-parent, or wheth-
er the non-parent must prove 'that it clearly would be
detrimental to the child to permit the parent to have
custody.' *Turner* held that the welfare of the child test
could not be satisfied by a best interests showing and that
what was required was a showing that parental custody
would clearly be detrimental to the child.

. . .

"We thus hold that in order to overcome the parental
preference a non-parent must show by clear and convincing
evidence that the parent is unfit or that the welfare of the
child requires the child to be in the custody of the non-
parent. One element of the welfare of the child require-
ment is that the non-parent must show that the child would
suffer clear detriment if placed in the custody of the par-
ent." [Footnotes omitted.]

In *In the Matter of the Guardianship of Williams*, 254 Kan.
814, 818–26, 869 P.2d 661, 665–70 (1994), that court said:

"The Kansas courts have long applied the best interests of
the child test in resolving custody disputes between two fit
parents.

"On the other hand, it has long been the rule that the
parental preference doctrine prevails when the dispute is
between a parent and a third person, unless the parent is
found to be unfit. The rule is succinctly stated ... as
follows:

'[A] parent who is able to care for his children and desires
to do so, and who has not been found to be an unfit
person to have their custody ... is entitled to the custody
of his children as against the grandparents ... even
though at the time ... such grandparents or others are
giving the children proper and suitable care and have
acquired an attachment for them.'

"[T]he court declared as unconstitutional a statutory provi-
sion which required the court to apply the best interests

test instead of the parental preference doctrine in certain parent-nonparent custody disputes.

. . .

" '[The natural mother] cannot be denied that right for the sole reason that a court determines and concludes that someone other than a natural parent might do a better job of raising the child, thus furthering his "best interests." '

. . .

"The best interests of the child test, which is asserted here by [the third-party guardian], has long been the preferred standard to apply when the custody of minor children is at issue between the natural parents of the child or children. However, absent highly unusual or extraordinary circumstances *it has no application* in determining whether a parent, not found to be unfit, is entitled to custody as against a third-party nonparent.

*"Not only is the parental preference doctrine one of long standing in Kansas, it is also the rule, in one form or another, in a majority of the jurisdictions in this country."* [Emphasis added.] [Citations omitted.] [Some alteration added.]

In *In the Interest of M.M.L.*, 258 Kan. 254, 900 P.2d 813 (1995), the Supreme Court of Kansas, quoting at length from its 1981 case of *Sheppard v. Sheppard*, 230 Kan. 146, 630 P.2d 1121 (1981), stated:

" 'Appellant contends that K.S.A.1980 Supp. 60–1610(b)(2) violates the due process clause because it destroys the parental preference doctrine and allows a third party to take custody of a minor child even though the natural parent is fit. That is the situation before us: The court found the mother fit, but granted custody of the child to the grandparents, finding that such custody would be in the best interests of the child.' "

*M.M.L.,* 258 Kan. at 263–64, 900 P.2d at 819 (quoting *Sheppard, supra* ). The *M.M.L.* court reversed the district court's order, stating:

" 'We have little doubt that the Due Process Clause would be offended "[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest." ' "

*M.M.L., supra* (quoting *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 555, 54 L.Ed.2d 511, *reh. denied* 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511 (1978)).

" 'It is clear under our decisions and those of the United States Supreme Court that *a natural parent's right to the custody of his or her children is a fundamental right which may not be disturbed by the State or by third persons, absent a showing that the natural parent is unfit.*

. . .

" '[The natural mother] cannot be denied that right for the sole reason that a court determines and concludes that someone other than a natural parent might do a better job of raising the child, thus furthering his "best interests." ' "

*M.M.L.,* 258 Kan. at 254, 900 P.2d at 819 (quoting *Sheppard, supra* ). The *M.M.L.* court continued:

" '[T]he welfare of children is always a matter of paramount concern, but the policy of the state proceeds on the theory that their welfare can best be attained by leaving them in the custody of their parents and seeing to it that the parents' right thereto is not infringed upon or denied. *This is the law of the land on the subject.* And it never becomes a *judicial* question as to what is for the welfare and best interests of children until the exceptional case arises where the parents are dead, or where they are unfit to be intrusted with the custody and rearing of their children and have forfeited this right because of breach of parental duty, or

where the right has been prejudiced by the discord of the parents themselves.'

" 'The best interests of the child test, which is asserted here by [the child's guardian], has long been the preferred standard to apply when the custody of minor children is at issue between the natural parents of the child or children. However, absent highly unusual or extraordinary circumstances *it has no application* in determining whether a parent, not found to be unfit, is entitled to custody against a third-party nonparent.' "

*Id.* at 266, 900 P.2d at 820 (citations omitted) (some emphasis added). *See also In the Interest of D.B.S v. M.S.,* 20 Kan. App.2d 438, 452, 888 P.2d 875, 884 (1995), a paternity case that cited *Williams, supra,* saying "On the one hand, it is clearly established that parental rights, not the child's best interests, control in disputes between parents and non-parents where the parent is fit."

The majority view is also consistent with the views of South Dakota. In the third-party custody and visitation case of *In the Matter of the Guardianship of Sedelmeier,* 491 N.W.2d 86, 87 (S.D.1992), the Supreme Court of South Dakota stated:

"In legal contests between a parent and a non-parent for the custody of a child the threshold question is: Is the parent unfit to have custody of the child? The Cumbers [non-parents] attempted to establish that it would be in the best interests of [the child] to be in their custody. Without unfitness being established, there is no necessity to look to the best interest of the child." [Alterations added.]

Quoting from its previous case of *Blow v. Lottman,* 75 S.D. 127, 59 N.W.2d 825 (1953), the *Sedelmeier* court further opined:

" '*We cannot take the position that this finding of "the best interest of said children" carries an inference of the mother's unfitness. It is a false view of the law and of the issues involved to treat the action from the start as an equal contest between two contenders for the child, and without the preliminary determination against the parent's right to*

*custody, to weigh the balance against the parent on a mere finding that it is for the best interests of the child to be given to the other party.'*

. . .

"Since there was no clear showing of unfitness, the court cannot order visitation for an unrelated non-parent over the wishes of the mother."

*Sedelmeier*, 491 N.W.2d at 88–89 (emphasis added).

Similarly, in the 1998 case of *In re Interest of Lukens*, 1998 N.D. 224, 587 N.W.2d 141, 144 (1998), the Supreme Court of North Dakota restated the law of that jurisdiction in reference to third party attempts to obtain custody of the child of others. The *Lukens* court, citing to and quoting from its prior cases, stated:

" 'The court cannot award custody to a third party, rather than the natural parent under a "best interest of the child" test unless it *first* determines that "exceptional circumstances" exist *to trigger* the best-interest analysis.'

"Intervenors contend courts should 'simply apply a "best interest" standard to all custodial cases, regardless of who the parties are.' We have rejected such arguments since . . . [1980]. We decline the invitation to abandon the 'exceptional circumstances' requirement before awarding child custody to a nonparent." [Citation omitted.] [Emphasis added.]

In *Hoff v. Berg*, 1999 N.D. 115, 595 N.W.2d 285, 291–92 (1999), the Supreme Court of North Dakota stated:

"We conclude N.D.C.C. § 14–09–05.1, as amended in 1993, is unconstitutional to the extent it requires courts to grant grandparents visitation rights with an unmarried minor unless visitation is found not to be in the child's best interests, and presumes visitation rights of grandparents are in a child's best interests, because it violates parents' fundamental liberty interest in controlling the persons with whom their children may associate, which is protected by

the due process clause of our state and federal constitutions."

In *Cox v. Cox,* 613 N.W.2d 516, 521–22 (N.D.2000), the Supreme Court of North Dakota again reaffirmed its position in the majority camp even though the possibility of a psychological parent existed. The court there stated:

"A court cannot award custody to a third party, rather than to a natural parent, under a 'best interests of the child' test, unless it first determines that exceptional circumstances exist *to trigger* the best-interests analysis. Absent exceptional circumstances, the natural parent is entitled to custody of the child even though the third party may be able to offer more amenities. When a psychological parent and a natural parent each seek a court-ordered award of custody, the natural parent's paramount right to custody must prevail unless the court determines it is necessary in the best interests of the child to award custody to the psychological parent *to prevent serious detriment to the welfare of the child.*" [Citations omitted.] [Emphasis added.]

Just a few years later, the North Dakota court further reiterated that even in a case where a psychological parent is involved, custody cannot be taken from a fit parent, except in order to avoid serious detriment to the child. In the case of *In the Interest of D.P.O. v. N.H.,* 667 N.W.2d 590, 593–94 (N.D.2003), it stated:

"*After* finding the maternal grandparents had established a psychological parent relationship with the child, the court properly applied the law in determining whether those exceptional circumstances required, in the child's best interests, that she be placed with the maternal grandparents rather than one of her natural parents to *prevent serious harm or detriment to the welfare of the child.* The court concluded the evidence did not demonstrate that Denise would suffer serious harm or detriment if she were placed in the custody of one of her natural parents rather than her psychological parents." [Emphasis added.]

In the recent case of *Toms v. Toms,* 98 S.W.3d 140, 145 n. 5 (Tenn.2003), the Supreme Court of Tennessee acknowledged Tennessee law in respect to third-party custody actions:

"In a contest between a parent and a non-parent, a parent cannot be deprived of the care and custody of a child unless there has been a finding of substantial harm to the child. Due process requires that a non-parent seeking custody of a child must show substantial harm by clear and convincing evidence. *Only after this showing is made* may a court engage in a general 'best interest of the child' evaluation in making a determination of custody." [Citations omitted.] [Emphasis added.]

One of the cases the *Toms* court cited in its footnote was *Bond v. McKenzie,* 896 S.W.2d 546, 548 (Tenn.1995), where that court held:

"Therefore, in a contest between a parent and a non-parent, a parent cannot be deprived of the custody of a child unless there has been a finding, after notice required by due process, of substantial harm to the child. *Only then* may a court engage in a general 'best interest of the child' evaluation in making a determination of custody." [Emphasis added.]

In *Petrosky v. Keene,* 898 S.W.2d 726, 728 (Tenn.1995), the Supreme Court of Tennessee wrote:

" '[I]n a contest between a parent and a non-parent, a parent cannot be deprived of the custody of a child unless there has been a finding ... of substantial harm to the child. *Only then* may a court engage in a general "best interest of the child" evaluation in making a determination of custody.'

"The proof in this case supports the trial court's finding that the father is not unfit to have custody, and that he has developed a substantial relationship with the child. It shows that the child is in no danger of substantial harm. The father, therefore, has a fundamental interest in parenting the child *which precludes a 'best interest' determination of custody."* [Alteration added.] [Emphasis added.]

The Supreme Court of Tennessee stated in *Hawk v. Hawk*, 855 S.W.2d 573, 579–81 (Tenn.1993), in reference to a grandparent visitation statute:

"We find, however, that without a substantial danger of harm to the child, a court may not constitutionally impose its own subjective notions of the 'best interests of the child' when an intact, nuclear family with fit, married parents is involved.

. . .

[N]either the legislature nor a court may properly intervene in parenting decisions absent significant harm to the child from those decisions." [Alteration added.]

It appears that the term "substantial harm to the child" used in Tennessee and perhaps in several other jurisdictions, is another way of stating "extraordinary circumstances," or "detrimental to the child" which is more often used. Either usage in the various cases requires that there be a prior determination that such a circumstance exists, before a "best interests of the child" analysis is appropriate.

With a caveat we footnote, *infra,* in reference to failure of adoption cases, Oklahoma has also placed itself in the majority column. The Supreme Court of Oklahoma stated in *Wade v. Geren,* 743 P.2d 1070, 1075 (Okla.1987): "But the [lower] court recognized that when the adoption decree had to be set aside it could not simply weigh or compare households; absent a showing of unfitness the father as natural parent would be entitled to custody as against anyone else" (alteration added). Previously, in *Grover v. Phillips,* 681 P.2d 81, 83 (Okla.1984), the court recognized that if the parent is deemed fit, custody with the parent is in the "best interests" of the child regardless of how much better off the child might be thought to be in the custody of third-party.

"Having determined that the natural father's home is a fit and proper home in which to raise the minor child, the preference accorded by law to the natural parent to the custody of his or her child determines that the best interests

of the child will be served by awarding custody to the natural parent."

In *McDonald v. Wrigley,* 870 P.2d 777 (Okla.1994), the Supreme Court of Oklahoma, after citing to *Haralson v. Haralson,* 595 P.2d 443 (Okla.1979), stated in a third-party case: "To obtain custody in a divorce proceeding, even on a temporary basis as is sought here, over the objection of a parent, a grandparent must show the parents' unfitness.... The unfitness may not be demonstrated by a mere comparison between what is offered by the competing parties ...." *McDonald,* 870 P.2d at 781(citation omitted). In *Haralson,* that court stated:

"This Court has repeatedly held that to deprive a parent of the custody of his children in favor of a third person, the parent must be affirmatively, *not comparatively,* shown to be unfit. The mere fact that a child might be better cared for by a third person is not sufficient to justify taking a child from its parent. In order for third persons to deprive a parent of custody of his children, some inability on the part of the parent to provide for the child's ordinary comfort, intellectual or moral development must be shown. Evidence of unfitness must be clear and conclusive and the necessity for depriving the parent of custody must be shown to be imperative." [34]

---

**34.** In Oklahoma there are at least two "failure of adoption" cases in which somewhat different language is used. The cases both relate to statutes seeming to create a "best interests" test based upon the fact that the adoptive parents are perceived to have acquired rights that other third parties do not acquire. In *In re Baby Girl L.,* 51 P.3d 544, 548, 552, 557 (Okla.2002), the court stated:

"This is a custody dispute between a married couple desiring to adopt, who have had custody of an infant child since a month after her birth, and the child's unmarried natural father, who has sought custody during that time.

"At issue is whether the trial court should have, once the adoption failed, conducted a hearing to determine the child's 'best interests' in placing custody. We conclude that a recently enacted [adoption] statute requires such a hearing, and that the trial court erred in not allowing the putative adoptive parents to offer evidence showing the

*Haralson,* 595 P.2d at 445 (emphasis added) (footnote added) (footnote omitted).

With a caveat distinguishing cases "where an adverse party [third-party] has had custody of a child for an appreciable period of time, in this case over four years . . . ." the Supreme Court of Idaho in *Stockwell v. Stockwell,* 116 Idaho 297, 299, 775 P.2d 611, 613 (1989), has utilized the majority approach. There the court stated, "The paramount consideration in any dispute involving the custody and care of a minor child is the child's best interests." But it immediately adopted the majority view in respect to third-party disputes.

"In custody disputes between a 'non-parent' (*i.e.,* an individual who is neither legal nor natural parent) and a natural parent, Idaho courts apply a presumption that a natural parent should have custody as opposed to other lineal or

---

likelihood of sever psychological harm to the child in the event of a custody transfer to the natural father.

. . .

"We conclude that the child and adoptive parents do not possess a Due Process right to a continued adoptive family relationship after a failed adoption merely because of the judicial creation of that temporary relationship. We thus need not engage in a balancing of constitutionally protected interests on this claim by the [proposed] adoptive parents.

. . .

"The trial court did not allow a statutorily-required best-interests hearing, or allow the adoptive parents to introduce evidence showing the likelihood of serious harm to the child by a change in the child's custody, and the order of the trial court must be reversed.

"We caution . . . that merely showing on remand that the child has a strong relationship with the adoptive parents or might be better off if left in their custody based on some type of comparative fitness test or balancing **is not enough** to show serious psychological harm. Our ruling here should not be interpreted as giving judicial imprimatur to some form of subtle social engineering in custody cases involving third parties and we are **not** sanctioning the reallocation of children merely because putative adoptive parents might be 'better' parents than a biological father. . . . Simply, the standard to be applied on remand is **not** one of comparative fitness nor is it one that may be used to victimize poor (or otherwise arguably disadvantaged) biological parents on the basis of some well-meaning, but misguided, view that certain adoptive custodians might possibly be 'better' parents than the child's biological parents." [Alterations added.] [Citations omitted.]

collateral relatives or interested parties. *This presumption operates to preclude consideration of the bests interests of the child unless the nonparent demonstrates either that the natural parent has abandoned the child, that the natural parent is unfit or that the child has been in the nonparent's custody for an appreciable period of time."* [The Idaho court determined that four years was an appreciable period of time.] [Alteration added.] [Emphasis added.]

Prior to 1996, the "best interest" test was essentially the exclusive test by virtue of statutes in all child custody matters in the state of Montana. In that year the Supreme Court of Montana, in the third-party custody case of *In re A.R.A.*, 277 Mont. 66, 71, 919 P.2d 388, 391 (1996), found the pertinent state statute unconstitutional and overruled its prior cases. The court declared:

"[W]e have held that it was not error for a district court to apply the best interest of the child test rather than the dependency, abuse, and neglect test as set forth in *Doney* [35] to determine custody between the natural father and the maternal grandmother. *Brost v. Glasgow,* (1982), 200 Mont. 194, 199, 651 P.2d 32,34. In *Brost,* we held that the 1979 Legislature, in § 40-4-221, MCA, changed the test to be used in determining custody when a custodial parent dies. *Brost,* 651 P.2d at 34. We again refused to require the stricter *Doney* standard in favor of the best interest of the child test in *In re C.G.* (1987), 228 Mont. 118, 740 P.2d 1139.

"However, in *Aschenbrenner* [36] and *Henderson v. Henderson* (1977), 174 Mont. 1, 568 P.2d 177, we held that the Uniform Marriage and Divorce Act (Title 40, Chapters 1 and 4) does not diminish the constitutionally protected rights of a natural parent to the custody of his or her child. It follows that an amendment to the Uniform Marriage and Divorce Act, however limited, cannot infringe upon those same rights. Therefore, the use of the best interest of the

**35.** *In re Doney,* 174 Mont. 282, 570 P.2d 575 (1977).

**36.** *In re Aschenbrenner,* 182 Mont. 540, 597 P.2d 1156 (1979).

child test, as referred to in § 40–4–221, MCA, is improper in that any showing that a nonparent may be able to provide a better environment than can a natural parent is irrelevant to the question of custody between the two in view of the constitutional rights of a parent to custody. Accordingly, § 40–4–221, MCA, is unconstitutional to the extent that it allows the granting of a § –221 petition prior to the termination of the natural parent's constitutional rights. We therefore overrule *Brost* and *In re C.G.* in their use of the best interest of the child test to award custody to a nonparent over a natural parent absent a finding of abuse and neglect or dependency." [Alteration added.] [Footnotes added.] [Some citations omitted.]

In the third-party case, *In re Guardianship of Ashleigh R.,* 132 N.M. 772, 778–79, 55 P.3d 984, 990–91 (2002), the Supreme Court of New Mexico held:

"The focus of the hearings, however, was which of the parties would be the better custodian for the children. The district court found that it would be in the best interest of the children to remain with Grandparents.

. . .

"Upon a finding of parental unfitness or extraordinary circumstances, the district court can then determine what custody arrangement would be in the comparative best interest of the children. *Absent such findings, however, the comparative best interest of the child standard does not apply in proceedings between parents and nonparents.* The comparative best interest of the child standard 'essentially compares the merits of the prospective custodians, and awards custody to the better of the two.' If only a showing of the comparative best interest of the child were required,

'a child might be taken away from the natural parent and given to a third party simply by showing that a third party could provide the better things in life for the child and therefore the "best interest" of the child would be satisfied by being placed with a third party.'

"The district court in this case applied the comparative best interest of the child standard without an express finding that Mother was unfit or that there were extraordinary circumstances justifying the application of that standard. This in itself was error." [Citations omitted.] [Emphasis added.]

The Supreme Court of North Carolina placed that state squarely with the majority of the states when it held in *Owenby v. Young,* 357 N.C. 142, 144–46, 579 S.E.2d 264, 266–68 (2003), that:

"We acknowledged the importance of this liberty interest nearly a decade ago when this Court held: 'absent a finding that parents (i) are unfit or (ii) have neglected the welfare of their children, the constitutionally protected paramount right of parents to custody, care, and control of their children must prevail.' ... *Therefore, unless a natural parent's conduct has been inconsistent with his or her constitutionally protected status, application of the 'best interest of the child' standard in a custody dispute with a nonparent offends the Due Process Clause of the United States Constitution.* Furthermore, the protected right [of parents to the custody of their children] is irrelevant in a custody proceeding between two natural parents, whether biological or adoptive, or between two parties who are not natural parents [third-parties]. In such instances, the trial court must determine custody using the 'best interest of the child' test.

. . .

"As we stressed in [a prior case], the Due Process Clause of the Fourteenth Amendment ensures that the government does not impermissibly infringe upon a natural parent's paramount right to custody solely to obtain a better result for the child. Until, and unless, the movant establishes by clear and convincing evidence that a natural parent's behavior, viewed cumulatively, has been inconsistent with his or her protected status, the 'best interest of the child' test is

simply not implicated." [Alterations added.] [Citations omitted.] [Emphasis added.]

In an earlier case, *Price v. Howard*, 346 N.C. 68, 79, 484 S.E.2d 528, 534 (1997), the same court had spoken similarly, stressing the responsibilities of natural parents, yet stated:

"If a natural parent's conduct has not been inconsistent with his or her constitutionally protected status, application of the 'best interest of the child' standard in a custody dispute with a nonparent would offend the Due Process Clause. However, conduct inconsistent with the parent's protected status, which need not rise to the statutory level warranting termination of parental rights would result in application of the 'best interest of the child' test without offending the Due Process Clause." [Citations omitted.]

*See also Petersen v. Rogers*, 337 N.C. 397, 404, 445 S.E.2d 901, 905 (N.C.1994) (citing *Best v. Best*, 81 N.C.App. 337, 344 S.E.2d 363 (1986)), where that court had previously noted:

"[P]laintiffs [the third-parties] argue that 'North Carolina recognizes the right of a minor child to be placed in the custody of the person or entity which will meet that child's best interests.' Further, plaintiffs argue that as to parents' custodial rights, our law recognizes no more than a 'higher evidentiary standard' which must apply in custody disputes between parents and those who are not natural parents; but 'the welfare of the child is paramount to all common law preferential rights of the parents.' In light of *Flores, Stanley*, and the principles enunciated in *Jolly[ v. Queen*, 264 N.C. 711, 142 S.E.2d 592 (1965) ] and [In re] *Hughes,*[ 254 N.C. 434, 119 S.E.2d 189 (1961) ] we explicitly reject these arguments. We hold that absent a finding that parents (i) are unfit or (ii) have neglected the welfare of their children, the constitutionally-protected paramount right of parents to custody, care, and control of their children must prevail. Language to the contrary in *Best v. Best*, 81 N.C.App. at 342, 344 S.E.2d at 367, is hereby expressly disavowed." [Alterations added.]

*But see Price v. Howard,* 346 N.C. 68, 484 S.E.2d 528 (1997), where the Supreme Court of North Carolina remanded the case to the trial court for it to determine whether the natural parent had acted inconsistently with her constitutionally protected interests.

Additionally, there are several North Carolina intermediate appellate that are consistent with *Owenby, supra.* In a pair of 2002 cases, the intermediate appellate court in North Carolina also made the distinction that the 'best interest' standard is inappropriate when third-parties are attempting to take custody away from the natural parents. In *McDuffie v. Mitchell,* 155 N.C.App. 587, 591, 573 S.E.2d 606, 608–09 (2002), the court stated:

> "Our courts recognize 'the general principle that because of the strength and importance of the parents' constitutionally protected interests, those interests must prevail against a third party unless the court finds that the parents are unfit or have neglected the welfare of their children.' ... Such allegations fall short of establishing that defendant acted in a manner inconsistent with his protected status. *A best interests analysis is not appropriate absent such a finding.*" [Citation omitted.] [Emphasis added.]

In *Grindstaff v. Byers,* 152 N.C.App. 288, 298, 567 S.E.2d 429, 435 (2002), in a dispute between a natural parent and third parties, where the natural parent was not found to be unfit, the court said:

> "We hold that there are no findings of fact that support the conclusion [of unfitness], and that there is no evidence in the record, that defendant acted inconsistent with his constitutionally protected status. The trial court erred by performing a 'best interest' analysis as between defendant and plaintiff. 'The fact that the third party is able to offer the minor child[ren] a higher standard of living does not overcome a natural parent's paramount interest in the custody and control of the child[ren].' " [Citations omitted.] [Some alteration added.]

The Supreme Court of Kentucky, opined in *Moore v. Asente*, 110 S.W.3d 336, 358–60 (Ky.2003), a failure of adoption case, as follows:

"Kentucky's appellate courts have recognized not only that 'parents of a child have a statutorily granted superior right to its care and custody,' but also 'that parents have fundamental, basic and constitutionally protected rights to raise their own children.' And, because we would necessarily abrogate those rights if we were to resolve custody disputes on a 'best interest of the child' standard after allowing a nonparent to obtain standing by mere possession of the child, we hold that 'physical custody' for the purposes of establishing standing requires more than 'actual possession and control of a child' at the time a custody action is commenced—*i.e.*, a showing 'that the [natural] parent has somehow voluntarily and indefinitely relinquished custody of a child.'

. . .

" 'Custody contests between a parent and a nonparent who does not fall within the statutory rule on "de facto" custodians[37] are determined under a standard requiring the nonparent to prove that the case falls within one of two exceptions to parental entitlement to custody. One exception to the parent's superior right to custody arises if the parent is shown to be "unfit" by clear and convincing evidence. A second exception arises if the parent has waived his or her superior right to custody.'

"Under the first exception, the nonparent must *first* show by clear and convincing evidence that the parent has engaged in conduct similar to activity that could result in the termination of parental rights by the state. *Only after making such a threshold showing* would the court deter-

---

**37.** Kentucky had a statute that set up the criteria for becoming a "de facto" custodian. If a party met the conditions for such status he was afforded, in so far as custody disputes were concerned, the status of a natural parent and the proper standard in such cases is the "best interest of the child" standard. *See* Ky.Rev.Stat. Ann. § 403.270.

mine custody in accordance with a child's best interest. Under the second exception, however, *if* a waiver has been shown by clear and convincing evidence, the trial court shall determine custody ... based on the best interest of the child." [Alteration added.] [Citations omitted.] [Emphasis added.] [Footnote added.] [Footnotes omitted.]

In a case primarily concerned with the jurisdiction of certain courts to terminate parental rights, the Supreme Court of Rhode Island in *Carr v. Prader*, 725 A.2d 291 (R.I.1999), nevertheless stated, quoting from a statute, that, "(parental rights may be terminated only upon a showing of, *inter alia,* wilful neglect, abandonment, desertion, or parental unfitness demonstrated by 'cruel or abusive nature' or 'chronic substance abuse')." *Id.* at 294.

The Supreme Judicial Court of Massachusetts, in a termination case, opined in *Custody of a Minor*, 389 Mass. 755, 765–68, 452 N.E.2d 483, 489 (1983), that:

"In furtherance of the policy of the Commonwealth, and recognizing that parents have a natural right of custody and children need care and protection, we have adopted the principle that parental unfitness must be persuasively shown in order to justify removal of a child from the custody of its parent. '[T]he unfitness standard must be applied whenever the State seeks to terminate parents' rights to the custody of their minor children, whether the State proceeds under the care and protection statute, the guardianship statute, or the adoption statute.' Custody is not to be transferred from the natural parent simply because another prospective custodian is thought to be better qualified. A comparison of the advantage the prospective custodian may offer to the child with those that may be offered by the natural parents is inappropriate." [Citations omitted.]

In *Guardianship of Clyde*, 44 Mass.App.Ct. 767, 694 N.E.2d 21 (1998), that court stated:

" 'The resolution of any custody dispute involving a natural parent necessarily begins with the premise that parents

have a natural right to the custody of their children.' The presumption at common law was that 'a child's welfare is best served in the care and custody of [his] parents. "The rights to conceive and to raise one's children [are] essential ... basic civil rights of man ... far more precious ... than property rights.... The interest of parents in their relationship with their children has been deemed fundamental and constitutionally protected." ' "

*Clyde*, 44 Mass.App.Ct. at 772, 694 N.E.2d at 25 (alterations added) (citations omitted). The *Clyde* court continued:

"The critical question in cases such as this one, where a biological parent seeks to remove his child from the custody of legal guardians, is 'whether the natural parent [ ][is] currently fit to further the welfare and best interests of the child.' *In the context of guardianship proceedings, '[e]vidence that is at least "clear and convincing" is constitutionally required for a finding of parental unfitness.' ('In recognition of the constitutionally protected interest of parents in maintaining the natural bond with their children, a judge must find by clear and convincing evidence that a parent is currently unfit to further the child's best interests' when irrevocably removing children from their biological parents). In making this determination, '[n]either the "parental fitness" test nor the "best interests of the child" test [can be] applied to the exclusion of the other.' Both tests 'reflect different degrees of emphasis on the same factors' and, therefore, are not separate and distinct but cognate and connected.'* "

*Id.* at 722–73, 694 N.E.2d at 25–26 (citations omitted) (emphasis added) (some alterations added). In *Guardianship of Yushiko*, 50 Mass.App.Ct. 157, 735 N.E.2d 1260 (2000), the court noted,

"Nevertheless, in deciding this issue, the judge focused chiefly on the best interests of the child.... The judge's reasoning that the child's station in life would improve if she remained with her guardians is also problematic. That the guardians can do more for the child than her father or that the father's income is less than that of the guardians is of

little consequence in considering what is in the child's best interests.

"Of greater import, however, is the judge's failure to recognize that the best interests of the child cannot be determined separate and apart from a determination of the current fitness of the father. 'The resolution of any custody dispute involving a ... parent necessarily begins with the premise that parents have a natural right to the custody of their children.' That right is not absolute for the State, as parens patriae, may interfere with that right to protect a child from serous physical or emotional harm. Thus, the judge was required to consider the fitness of the father in determining what was in the best interest of the child.

. . .

"Finally, the comparison of the life the father can offer his child with the 'better life' the guardians can provide is inappropriate for it does not clearly recognize the father's presumptive right to raise his child."

*Id.* at 158–60, 735 N.E.2d at 1262–63 (citations omitted).[38]

The Court of Appeals of Minnesota, in *In re the Welfare of P.L.C. and D.L.C.*, 384 N.W.2d 222, 225 (Minn.App.1986), opined in a parent/grandparent dispute over guardianship:

"[T]here is no conflict between the two standards. The first part of the rule speaks in terms of 'entitle[ment]' to custody, or parental rights, and the second in terms of the best interests of the child. The presumption of parental fitness, however, is not only an acknowledgment of parental rights; it has long been held to be a presumption that the best interests of the child are served by parental custody."

The Supreme Court of Mississippi recently opined in *In re Custody of M.A.G.*, 859 So.2d 1001, 1004 (Miss.2003), that:

"As far back as 1929, this Court has held that when one parent dies, the other parent has a right to the child's custody until there has been abandonment or the living

---

**38.** We include Massachusetts in the majority because of the Massachusetts Supreme Judicial Court case.

parent has forfeited that right by immoral conduct. More recently, this Court has ruled unfitness may be shown by (1) abandoning the child; (2) behaving so immorally as to be detrimental to the child; or (3) being unfit mentally or otherwise to have custody of the child. Despite A.G.'s contention otherwise, the Chancellor clearly found him to be an unfit parent. Only after this determination had been made, did the Chancellor follow the *Albright* factors[39] to decide M.A.G.'s best interest.... Clearly, however, a finding of unfitness is necessary to award custody to a third party against a natural parent and must be done *before* any analysis using the *Albright* factors to determine the best interest of the child." [Citations omitted.] [Emphasis added.] [Footnote added.]

In 1992, citing to a previous case, the Supreme Court of Mississippi, in *Westbrook v. Oglesbee,* 606 So.2d 1142 (Miss. 1992), had stated:

" 'In such contest [*i.e.*, custody disputes between parents and grandparents] it is presumed that the best interests of the child will be preserved by it remaining with its parents or parent. *In order to overcome this presumption there must be a clear showing that the parent has (1) abandoned the child, or (2) the conduct of the parent is so immoral to be detrimental to the child, or (3) the parent is unfit mentally or otherwise to have the custody of his or her child.' "*

*Id.* at 1144–45 (quoting *Rodgers v. Rodgers,* 274 So.2d 671, 673 (Miss.1973)).

---

**39.** *Albright v. Albright,* 437 So.2d 1003 (Miss.1983), was a custody dispute between two natural parents in which the father was challenging the "tender age" doctrine in Georgia which created a maternal presumption, *i.e.*, that it was in the best interest of the child to have custody with his mother. In discussing that issue, the court reaffirmed its position that the "best interest of the child" controlled. We presume that the Mississippi court was modifying the "best interest" standard in third-party cases such as *M.A.G, supra.* As we have indicated the "best interest" provision is generally only initially applicable in contests between natural parents or in contests where all parties are third parties.

In *Drummond v. Fulton County Dept. of Family and Children Svs.*, 237 Ga. 449, 228 S.E.2d 839 (1976), the Supreme Court of Georgia wrote: "The Georgia law, however, has not followed this pattern. The best interests of the child test is used only between parents who both have equal rights to the child. Where the dispute is between a natural parent and a third party, on the other hand, the court must award the custody of the child to the parent unless he has lost his parental prerogatives .... or is unfit." *Drummond*, 237 Ga. at 451, 228 S.E.2d at 842 (citations omitted).

In *Larson v. Gambrell*, 157 Ga.App. 193, 276 S.E.2d 686 (1981), that court said:

"As between parents with equal rights to custody the child's 'best interests' is the only determinative factor since the law presumes that 'the welfare and best interest of a child will best be served, except in extraordinary cases, by his being in the custody of his own parent.' However, an award of child custody to a third party must be based upon more than the 'best interests' of the child because such an award is in derogation of the right to custody of the parent, in whose custody the law presumes the child's best interest will be served. Thus, it is only when the present unfitness of the parent is established by clear and convincing evidence that the trial judge is authorized to consider an award of custody to third parties."

*Id.* at 194, 276 S.E.2d at 688 (citation omitted). The *Larson* court continued:

" 'The law contemplates that one of the natural parents will be awarded custody of the child unless the present unfitness of the parents is established by clear and convincing evidence .... *Only* then is the trial court authorized to consider an award of custody to third parties.' "

*Id.* at 194, 276 S.E.2d at 689 (emphasis added) (quoting *Childs v. Childs*, 237 Ga. 177, 178, 227 S.E.2d 49, 50 (1976)).[40]

---

**40.** In *Clark v. Wade*, 273 Ga. 587, 544 S.E.2d 99 (2001), the Supreme Court of Georgia, at first blush, appears to have modified *Childs*, by adopting a hybrid standard:

In a post-*Troxel* case, the intermediate appellate court in Virginia held that:

"Custody and visitation disputes between two fit parents involve one parent's fundamental right pitted against the other parent's fundamental right. The discretion afforded trial courts under the best-interests test reflects a finely balanced judicial response to this parental deadlock. A very different kind of legal contest, however, exists in a dispute between a fit parent and a non-parent. In this latter situation, the best-interests test should be applied *only if*

"Unlike the grandparent visitation cases, however, the custody cases in this appeal do not involve a third party seeking to intrude upon an established parent-child custodial relationship. Instead, they involve a biological parent seeking to gain custody from a third party who has been responsible for the daily care of the child and already has established a family unit for the child. Thus, the relationship among the parent, child, and third-party relative differs in these custody cases from the relationship among the parties in *Troxel* and other grandparent visitation cases. Applying the Court's distinction in the unwed father cases, more than a biological link exists between the child and noncustodial father, but the relationship does not rise to the level of a daily association.

. . .

Aligned against the parents' constitutional right is the child's constitutional right to protection of his or her person and the state's compelling interest in protecting the welfare of children.

[Although] in most instances it will be found that the legal right of the parent and the interest of the child are the same[, i]f through misconduct or other circumstances it appears that the case is exceptional, and that the welfare of the child requires that it should be separated even from its parent, the parens patriae must protect the helpless and the innocent.

. . .

Applying a narrowing construction that is consistent with both the legislature's intent and *Brooks v. Parkerson*, [265 Ga. 189, 454 S.E.2d 769 (1995)] we interpret the "best-interest-of-the-child" standard in OCGA §§ 19-7-1(b.1) [enacted in 1996 and governing 'custody disputes between a biological parent and a limited number of third parties who are related to the child'] and as requiring the third party to show that parental custody would harm the child to rebut the statutory presumption in favor of the parent. *Once this presumption is overcome*, [but not before] the third party must show that an award of custody to him or her will best promote the child's health, welfare, and happiness."

*Clark*, 273 Ga. at 596–98, 544 S.E.2d at 106–07 (citation omitted) (emphasis added) (footnotes omitted) (some alterations added).

the trial court first finds 'an actual harm to the child's health or welfare without such visitation.'

. . .

"Absent a showing of actual harm to the child, the constitutional liberty interests of fit parents 'take precedence over the "best interests" of the child.' As a result, 'a court may not impose its subjective notions of 'best interests of the child' in derogation of parental rights protected by the Constitution. A 'vague generalization about the positive influence' of non-parent visitation cannot satisfy the actual-harm requirement."

*Griffin v. Griffin,* 41 Va.App. 77, 83–85, 581 S.E.2d 899, 902–03 (2003) (citations omitted) (emphasis added).

The Florida Supreme Court in *Beagle v. Beagle,* 678 So.2d 1271 (Fla.1996), in respect to a visitation statute, opined:

"We have stated that 'this Court and others have recognized a longstanding and fundamental liberty interest of parents in determining the care and upbringing of their children free from the heavy hand of government paternalism.' The fundamental liberty interest in parenting is protected by both the Florida and federal constitutions. In Florida, it is specifically protected by our privacy provision. Certainly the imposition, by the State, of grandparental visitation rights implicates the privacy rights of the Florida Constitution.

. . .

"Based upon the privacy provision in the Florida Constitution, we hold that the State may not intrude upon the parents' fundamental right to raise their children except in cases where the child is threatened with harm. While it may be argued that harm or detriment is always an element of a best interest analysis, we must join our sister courts in Tennessee and Georgia in ruling that a best interest test without an explicit requirement of harm cannot pass constitutional muster in this specific context. In addressing the

subjective nature of a best interest analysis in the absence of demonstrable harm, the Supreme Court of Tennessee stated:

'The trial court in this case engaged in the presumptive analysis we seek to avoid.... Without finding that the parents were unfit or that a dissolving marriage between the parents had brought the matter of child custody before the court, the court imposed its own notion of the children's best interests over the shared opinion of these parents, stripping them of their right to control in parenting decisions.'

*Hawk v. Hawk,* 855 S.W.2d 573, 582 (Tenn.1993). Then, the Supreme Court of Georgia succinctly clarified the difference between a mere best interest analysis and the requirement that a harm be demonstrated:

'However, even assuming grandparent visitation promotes the health and welfare of the child, the state may only impose that visitation over the parents' objections on a showing that failing to do so would be harmful to the child. It is irrelevant, to this constitutional analysis, that it might in many instances be "better" or "desirable" for a child to maintain contact with a grandparent.'

*Brooks [v. Parkerson,* 265 Ga. 189], 454 S.E.2d [769,] 773–74 [ (1995) ] (footnote omitted). We agree with this reasoning. Without a finding of harm, we are unable to conclude that the State demonstrates a compelling interest."

*Beagle,* 678 So.2d at 1275–77 (alterations added).

The Florida Supreme Court in *In re Guardianship of D.A. McW.,* 460 So.2d 368, 370 (Fla.1984), stated, "In [a prior case], we held that in such a circumstance [third-party cases], custody should be denied to the natural parent only when such an award will, in fact, be detrimental to the welfare of the child" (alterations added) (citations omitted). The intermediate appellate court of Florida has also relatively recently discussed the issue, further explaining the position that Florida has taken by noting positions in that state that appear to be consistent with the majority view. In *Hammond v. Howard,*

828 So.2d 476, 477–78 (Fla.App.2002), the court stated, "The best interest test, which generally governs custody disputes between two parents, is not the correct standard either. *See* [*In re D.A. McW., supra*] (affirming that the 'best interests' test is not the proper legal standard for determining custody between a natural parent and a third party) ...." (citations omitted). In *In the Marriage of Matzen*, 600 So.2d 487, 489–90 (Fla.App.1992), the court said:

> "More importantly, Florida law does not permit a custody determination, under the instant facts [contest with a third-party], to be based merely on what one party can provide financially, spiritually, educationally or otherwise, relative to the other party. It is not enough for appellees [grandparents] to contend that they are more mature or that they can better provide for the children's educational needs or religious instruction.... '[O]nce the father's ability reaches adequacy, his legal right should not be overcome by the fact that the respondents' offerings may be more adequate than his, or that they man continually out-do him, at least in material matters. Instead the focus is necessarily on the parent.'" [Alteration added.] [Citation omitted.]

In a previous Florida case, *Daugharty v. Daugharty*, 571 So.2d 85, 86 (Fla.App.1990) the court stated:

> "The concern we have in this case is whether the proper legal standard was applied.... The stated finding that the best interests of the children would be served by awarding custody to the grandmother implies that the 'best interest' standard was applied. The best interest standard is applied in a dispute between two parents where both are fit and have equal rights to custody. In the instant case, where the custody dispute is between the parents and a third person, the rights of the parents are paramount unless there is a showing that the parents are unfit or that, for some substantial reason, custody in either or both of the parents would be detrimental to the child's welfare." [Citation omitted.]

An intermediate appellate court in Florida had previously explained that State's position in a custody dispute between a natural father and the maternal grandparents. In *Leonard v. Myers*, 553 So.2d 291(Fla.App.1989), that court stated:

"Courts of this state hold that a natural parent should be denied custody of his child only where it is demonstrated that such custody will be detrimental to the welfare of the child or that the parent is disabled from exercising custody. While the best interests of the child is the only test in a custody dispute between two parents, where the dispute is between a parent and a third-party, the court must consider the right of a natural parent to enjoy the custody, fellowship, and companionship of his offspring.

"There has been no finding, nor is there evidence to support a finding that the appellant is unfit or that his custody would in any way be detrimental to the welfare of the child."

*Id.* at 292 (citations omitted).

Intermediate appellate courts in Indiana have also commented on the correct analysis in cases of guardianship involving grandparents and natural parents. In *Peterson v. Riley*, 597 N.E.2d 995, 997 (Ind.App.1992), that court stated: "While Indiana courts can award custody of a child to someone other than the parents, such awards usually are made only following a determination that the parents are either unfit or have all but abandoned the child to the care of that third person." This position reflected the determination of a previous Indiana intermediate appellate court in the case of *In re Custody of McGuire*, 487 N.E.2d 457 (Ind.App.1985):

"We are not here confronted with a custody dispute between two parents. In such a case, each parent has an equal right to custody and there is no presumption favoring either parent. In this sense, parents are on par with one another and the seminal issue is the best interest of the child. On the other hand, in a custody dispute between a parent and a third party, such as we have here, the focus is significantly different because the parties are not on par. Although the child's best interest is still of great impor-

tance, it is *presumed* that it is in the best interest of the child to be placed in the custody of the parent. Consequently, a nonparent who seeks to displace the parent as custodian bears the burden of overcoming the parent's presumptively superior right to custody. This burden has been described to require a showing, by clear and cogent evidence, that the parent is unfit or has acquiesced in or voluntarily relinquished custody to the third party for such a long period of time that 'the affections of the child and the third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child.' "

*McGuire*, 487 N.E.2d at 460 (citations omitted).

The intermediate appellate court in Utah similarly opined in *Duncan v. Howard*, 918 P.2d 888, 892 (Utah App.1996): "Therefore, only *after* this [parental] presumption is appropriately rebutted can [the grandparents], who are not [the child's] parents, successfully show that it would be otherwise in [the child's] best interest to remain in their custody" (alterations added). *See also Kishpaugh v. Kishpaugh*, 745 P.2d 1248, 1251 (Utah 1987) ("Under *Hutchison*, therefore, a trial court may base a custody award on its own determination of the best interests of the child *only if it finds all three enumerated characteristics lacking.*" (emphasis added)). There are cases in Utah, *Hutchison v. Hutchison*, 649 P.2d 38 (Utah 1982), that, like Maryland in *Ross v. Hoffman, supra,* start out saying that the best interests of the child controls, but then insert a proviso that it only applies if the parents are unfit, extraordinary circumstances exist or the natural parents have forfeited their rights to parent.

## D. Holding

The best interests of the child standard is, axiomatically, of a different nature than a parent's fundamental constitutional right. Moreover, the best interests of the child standard in third-party cases is not simply an adding of the "pluses" offered by one party over another. Were that so, any third party who offered a better neighborhood, better school-

ing, more financial capability, or more stability would consistently prevail in obtaining custody in spite of a fit natural parent's constitutional right to parent. Our case law does not allow for such a result that dilutes a parent's constitutional right to rear his or her child based merely upon such considerations.[41] Quite simply, the non-constitutional best interests of the child standard, absent extraordinary (*i.e.*, exceptional) circumstances, does not override a parent's fundamental constitutional right to raise his or her child when the case is between a fit parent, to whom the fundamental parental right is inherent, and a third party who does not possess such constitutionally-protected parental rights. In cases *between fit natural parents* who both have the fundamental constitutional rights to parent, the best interests of the child will be the "ultimate, determinative factor." *Shurupoff,* 372 Md. at 662, 814 A.2d at 557. In respect to third-party custody disputes, we shall adopt for Maryland, if we have not already done so, the majority position. In the balancing of court-created or statutorily-created "standards," such as "the best interest of the child" test, with fundamental constitutional rights, in private custody actions involving private third-parties where the parents are fit, absent extraordinary (*i.e.*, exceptional) circumstances, the constitutional right is the ultimate determinative factor; and only if the parents are unfit or extraordinary circumstances exist is the "best interest of the

---

41. In the case of *In re Adoption/Guardianship Nos. J9610436 and J9711031,* 368 Md. 666, 796 A.2d 778 (2002), this Court reversed a circuit court's determination that the best interests of the children warranted termination of the parental rights of a father with mental limitations. We stated:

"[F]undamental constitutional rights, *i.e.*, the child rearing rights at issue here, can only be completely terminated upon the clearest and most convincing evidence that the parent, however poor, uneducated, or disabled, cannot and will not, even with proper assistance, be able to sufficiently parent his children in the reasonable future.

"In termination cases, the 'best interests' analysis should not be automatically interpreted to be a search for a perfect, or more perfect, or even a better situation for any particular child. Life is not perfect. Children are born into different circumstances—some into wealth and other advantage, some not."

*Id.* at 699–700, 796 A.2d at 797–98 (alteration added).

child" test to be considered, any contrary comment in *Shuru-poff*, or other of our cases, notwithstanding.

### E. Factors for a Finding of "Exceptional Circumstances"

█ In support of its holding in respect to the case *sub judice*, the Circuit Court for Harford County examined the standards and guidelines that generate "exceptional circumstances" and found their application warranted placing custody with the maternal grandparents. In *Hoffman*, 280 Md. at 191, 372 A.2d at 593, we first aggregated these factors from a survey of this Court's earlier case law, and later as to "extraordinary circumstances," affirmed their application in *Shurupoff*, 372 Md. at 646, 814 A.2d at 548. We stated in *Ross v. Hoffman*:

> "The factors which emerge from our prior decisions which may be of probative value in determining the existence of exceptional circumstances include the [1] length of time the child has been away from the biological parent, [2] the age of the child when care was assumed by the third party, [3] the possible emotional effect on the child of a change of custody, [4] the period of time which elapsed before the parent sought to reclaim the child, [5] the nature and strength of the ties between the child and the third party custodian, [6] the intensity and genuineness of the parent's desire to have the child, [7] the stability and certainty as to the child's future in the custody of the parent."

*Hoffman*, 280 Md. at 191, 372 A.2d at 593 (alterations added). The need to find "exceptional circumstances" is derived from the belief that extreme care must be exercised in determining a custody placement other than with a fit parent.

█ The circuit court examined each of the *Hoffman* guidelines in turn, and, in its opinion, found Mr. McDermott's relationship with Patrick to be wanting, particularly in relation to his absences from the child's life while at sea. The circuit court presented the following summary in its September 2003 memorandum opinion, which stated, in relevant part:

"1. *The length of time the child has been away from the biological parent.* Patrick as been in the custody of his grandparents since February 13, 2002 pursuant to an Order by consent granting temporary joint legal custody to the Doughertys and the McDermotts, with primary residence to the Doughertys. Notwithstanding the court's order, Mr. McDermott had *de facto* custody of Patrick from August 2002 until December 2002, at which time he returned to sea duty. Patrick has also spent considerable time with his father during the summer of 2003. As previously noted, there have been several other periods of time in which Patrick was in the custody of his grandparents or his mother, most being periods of time that Mr. McDermott was not residing in the State of Maryland but was pursuing his occupation as a merchant seaman. *When Mr. McDermott has been present in Maryland, he has had regular and frequent contact with Patrick.*

2. *The age of the child when care was assumed by the third party.* Patrick is now eight years old; he was six years old when the temporary custody order granting joint custody to the Doughertys and the McDermotts was signed on in February 2002. From May 2001 through January 2002, Patrick was in the custody of his [mother] Ms. Dougherty, and prior thereto, in the custody of his father when he was not at sea. Essentially, Patrick has moved around quite a bit since he was born. He has lived with both parents at different times, and sometimes with the Doughertys, and his primary caretakers at one time or another were not necessarily those persons who were named as such in the various, applicable court orders.

3. *The possible emotional effect on the child of a change in custody.* It is clear from all testimony that Patrick has strong emotional attachments to all members of his family, both parents and grandparents. [Patrick's court-appointed attorney] testified that Patrick is doing well in school and that his school ... represents an anchor in his life. [Patrick's court-appointed attorney] also offered that the Doughertys have given Patrick the stability that he needs ....

Custody of Patrick has been changed several times during his short life; at this point, continuity and stability are important considerations before this Court. Although he has resided with his maternal grandparents since January 2002, he continues to have regular and unfettered visitation with his mother and father. The court is concerned that should Mr. McDermott be granted custody of Patrick, his propensity for using Patrick as a pawn in the conflict between him and Ms. Dougherty, and now the Doughertys, will obstruct natural family relationships with the maternal side of Patrick's family.

4. *The period of time which elapsed before the parent sought to reclaim the child. Generally, when Mr. McDermott has relinquished custody of Patrick, it has been because he went to sea.* His periods at sea have lasted several months, after which he has sought to regain custody of Patrick.

5. *The nature and strength of the ties between the child and the third party custodian.* There is no question that Patrick is very close to the Doughertys. His maternal grandparents have always been a part of Patrick's life, and, during many periods, have cared for him exclusively.

6. *The intensity and genuineness of the parent's desire to have the child. It is clear from Mr. McDermott's testimony that he feels that Patrick's interests are served by being in his custody, that his care and custody would be superior to any other family member, and that he has a genuine interest in raising Patrick.* However, the court is unable to agree with the totality of Mr. McDermott's self-assessment. It has appeared at various time during these proceedings that Mr. McDermott's interest in having custody of Patrick was not strictly limited to his desire to care for Patrick, but also his desire to control Ms. Dougherty, and that he has used Patrick as a pawn in the ongoing engagement between Ms. Dougherty and himself. . . . Although Mr. McDermott indicated . . . that he would remain in Harford County should he gain sole custody of Patrick, the court is unconvinced of his sincerity in this regard.

7. *The stability and certainty as to the child's future in the custody of the parent.* Mr. McDermott was initially awarded custody in this case. For the most part, custody was changed first to Ms. Dougherty and then to the Doughertys because of Mr. McDermott's lengthy periods of absence from the State due to his employment as a merchant seaman. It would appear that Mr. McDermott's periodic absences and relinquishment of custody [have] had adverse effects on Patrick. For example, shortly after Ms. Dougherty's arrest and subsequent incarceration in early 2002, Mr. McDermott signed onto ship going to Africa and not expected to return until summer 2002. . . . [42] It is self-evident that a revolving door of custodians would not be in Patrick's best interest, now or in the future." [Alterations added.] [Footnote added.] [Some emphasis added.]

We conclude that the circuit court inappropriately found that the absences inherent in Mr. McDermott's job requirements constituted "exceptional circumstances."

First, we note that, although the Circuit Court for Harford County expressed some reservation as to Mr. McDermott's ability to provide a "consistent and stable environment for his child," it failed to find Mr. McDermott to be an unfit parent[43] and it is presumed that fit parents act in the best interests of their children. *See Parham v. J.R.,* 442 U.S. 584, 602, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101 (1979). As we explained in *In re Yve S.,* 373 Md. 551, 819 A.2d 1030 (2003):

" 'The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's

---

**42.** The Doughertys testified that, acting on the advice of their counsel in another matter, they intentionally kept from Mr. McDermott the fact of Ms. Dougherty's incarceration. Thus, when Mr. McDermott signed the contract in either December 2001, or very early January 2002, to serve aboard the ship it is not clear that he knew that Patrick's mother was already, or shortly would be, serving time in jail.

**43.** We do not mean to imply that there is anything in this record to suggest a finding of unfitness.

difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.'"

Id. at 572, 819 A.2d at 1042 (quoting *Parham*, 442 U.S. at 602, 99 S.Ct. at 2504).

Mr. McDermott's parental fitness having been established, or more precisely, not adjudged to be lacking, the inquiry, according to *Hoffman*, shifts to examining whether any "exceptional circumstances" exist that might overcome the presumption favoring a fit parent's rearing of his child:

> "When the dispute is between a biological parent and a third party, it is presumed that the child's best interest is [served] by custody in the parent. That presumption is overcome and such custody will be denied if (a) the parent is unfit to have custody, *or* (b) if there are such exceptional circumstances as make such custody *detrimental* to the best interest of the child. Therefore, in parent-third party disputes over custody, it is only upon a determination by the equity court that the parent is unfit or that there are exceptional circumstances which make custody in the parent detrimental to the best interest of the child, that the court need inquire into the best interest of the child in order to make a proper custodial disposition."

*Hoffman*, 280 Md. at 178–79, 372 A.2d at 587 (alteration added) (emphasis added). It is in this latter phase of the inquiry that the circuit court erred by inappropriately equating "exceptional circumstances" with the absences occasioned by Mr. McDermott's merchant marine work. By finding that the dictates of Mr. McDermott's employment voided his right to be a custodial parent, the circuit court overlooked its own lack of a finding of unfitness and failed to accord petitioner with the presumptive benefits of a natural parent, especially a fit natural parent.

In *Ross v. Pick*, 199 Md. 341, 86 A.2d 463 (1952), this Court explained the requisite showing to overcome the presumption that a child's best interests are served by the child's remaining in the custody of the parent:

"Where parents claim the custody of a child, there is a *prima facie* presumption that the child's welfare will be best subserved in the care and custody of its parents rather than in the custody of others, and the burden is then cast upon the parties opposing them to show the contrary."

*Id.* at 351, 86 A.2d at 468. *See also Shurupoff*, 372 Md. at 662, 814 A.2d at 557 (reiterating that "it is presumed that the child's best interest lies with parental custody" subject to a showing that the parent ·is fit or that no exceptional circumstances exist). Accordingly, it was the Doughertys' burden to show that "exceptional circumstances" existed for a granting of custody in their favor; it was not Mr. McDermott's burden to demonstrate the *absence* of "exceptional circumstances." Indeed, it is· a weighty task (or should be) for a third party seeking custody to demonstrate "exceptional circumstances" which overcome the presumption that a parent acts in the best interest of his or her children and which overcome the constitutional right of a parent to raise his or her own children.[44] In

---

**44.** We do not mean to indicate, however, that the existence of "exceptional circumstances" is chimerical and cannot ever be proven.

Our courts over the years have found "exceptional circumstances" in awarding custody even to third parties, generally upon a parent's prolonged, non-work-related absence and the child's having been in the consistent care of a third party for a period of years. In *Dietrich v. Anderson*, 185 Md. 103, 43 A.2d 186 (1945) (declining to remove child from custody of child's aunt and uncle in Maryland who had raised the four-year-old since birth due to natural mother's return to her home state of Iowa and natural father's four-year absence to attend college and later return to Maryland in pursuit of custody), this Court stated, "[W]hen reclamation is not sought until a lapse of years, when new ties have been formed and a certain current given to the child's life and thought, much attention should be paid to the probabilities of a benefit to the child from the change." *Id.* at 119, 43 A.2d at 193. *In the present case, the father's absences have not been computed in years' long periods, nor is there evidence that the child has failed to maintain bonds with him.*

*See Piotrowski v. State*, 179 ·Md. 377, 18 A.2d 199 (1941) (following mother's death, court maintained custody of eight-year-old girl with her paternal grandparents so that child would remain in the only home she had known and stating that the infrequent visits by child's father following his remarriage failed to establish that the child's already-favorable situation would improve upon a modification of custody); *Trenton v. Christ*, 216 Md. 418, 140 A.2d 660 (1958) (maintaining child

determining that Mr. McDermott's job duties at sea rose to the level of "exceptional circumstances," however, the circuit court improperly penalized a fit parent who desired custody of his son, and placed on the parent the burden of disproving that which is questionably not even a proper "exceptional circumstances" consideration.

### F. Father's Employment in the Merchant Marine

Mr. McDermott is a graduate of the United States Merchant Marine Academy and a licensed ship Captain in the Merchant Marine. Many of his previous jobs have involved maritime work. Prior to his marriage he worked aboard ships but upon his marriage he ceased ocean-going and worked primarily in the Port of Baltimore. Following his divorce from Ms. Dougherty, petitioner accepted periodic jobs which took him to sea for several months at a time. Such is the

---

in custody of maternal grandparents based on finding exceptional circumstances arising from ten-year-old child's serious emotional upset upon contemplation of a change in her decade-long living situation and child having never visited father or his new family at the family's recent homes in Delaware or Michigan). In the present case the child was emotional because his visits with his father were threatened. He wanted to be with his father. *See Melton v. Connolly*, 219 Md. 184, 148 A.2d 387 (1959) (encouraging visitation with father but ruling that child's having lived in a clean and nurturing environment with deceased mother's sister and family for a four-and-one-half-year period rendered it in child's best interest to remain with aunt despite father's petition for custody); *DeGrange v. Kline*, 254 Md. 240, 254 A.2d 353 (1969) (holding that divorced father's long hours working as tool and die maker during which time child would be left in care of non-relatives, combined with father's dishonorable discharge from Army for larceny charge and year-long absence from the child's life merited awarding custody to maternal aunt and uncle who had assumed care of the child two years prior when the child's mother brought the child to them in a weak and malnourished state and then disappeared).

*See also Burrows v. Sanders*, 99 Md.App. 69, 77–78, 635 A.2d 82, 86 (1994) (upholding chancellor's finding of "exceptional circumstances" in awarding custody of child, born to a sixteen-year-old mother, to paternal grandparents who had raised the child for four years, and observing that granting the mother substantial visitation was in recognition of her improved condition and potential to receive full custody in the future). *The circumstances of the case sub judice do not rise to the level of the above cases in respect to the issue of "exceptional circumstances."*

nature of much maritime work, and the attendant required time commitments also are not uncommon in other lines of work including military deployments, ground transportation of goods, natural gas and oil production, offshore commercial fishing, sport fishing, etc.[45]

Mr. McDermott's job duties do not involve work that is illegal, untoward, or otherwise injurious. Nor is there evidence in this case of any illegal conduct on his part. While his required absences from Maryland for consecutive months at sea may occasion interruptions in his relationship with Patrick and may be less than ideal, such work is the employment especially available to him and for which he has particularized training. This Court recognizes Maryland's tradition as a maritime State wherein any number of our residents engage in various activities at sea and beyond and going to sea is but one of many occupations which require the worker to depart the State and absent himself or herself for months at a time. We would be loathe to reach a holding that jeopardizes a fit parent's right to custody of his child, by the change of custody to third parties, simply because the source of what is his livelihood and his means to support himself and his family takes him from the State for months' long periods of time.

Although casting its decision in the light of Mr. McDermott's having voluntarily gone to sea, the circuit court actually

---

**45.** Many offshore sport-fishing boats migrate north and south with the seasons and the "runs" of marlin, tuna, etc. Their captains and crews are often gone from their home ports for months at a time, as are commercial fisherman such as long-liners, ocean scallopers and the like. Their families, usually spouses, but one supposes other family members on occasion, tend the children while the parent is gone. While in disputes between natural parents the "best interests" standard may well result in the home-ported parent prevailing over the absent parent, the nature of the work should not impinge upon the absent parent's constitutional rights in third-party disputes.

Other vocations that require extended absences from home would be those involved in major construction projects, tunnel workers, high steel workers, Alaskan cannery workers, United Nations' workers on duty in foreign countries, members of the State Department on years-long duty abroad, workers for overseas construction companies, and perhaps a myriad of other vocations.

penalized Mr. McDermott for the absences occasioned by the essential terms and very nature of his employment. It is difficult, if not impossible, to work as a seaman without going to sea.

At one hearing, the circuit court was incredulous of Mr. McDermott's explanation at trial that he had resigned from his position as a merchant marine, but maintained his membership in the union of merchant mariners in order to sustain Patrick's health insurance. Instead, the court chose to believe that Mr. McDermott's ongoing membership was for the purpose of keeping open the possibility that he might re-engage in maritime work at some future date, even if he had sole custody of Patrick.[46] The Doughertys urged their selection as the stable custodians, contending that the father's lifestyle as a merchant seaman "presented a challenge to the [c]ourt in terms of his ability to care for his child on a consistent basis ... and he has left the state of Maryland for various lengths of time during the course of this case" (alteration added).

The Doughertys' argument implies that Mr. McDermott's absences from the State, which were occasioned solely by the dictates of his employment, would be the only obstacle to his otherwise deserving full custody of Patrick. Thus, according to respondents' reasoning, Mr. McDermott's parenting rights are contingent on his employment. The Doughertys maintain that the circuit court's finding was not dependent on the specific *type* of employment held by Mr. McDermott, but rather it was the accumulation, timing, and voluntariness of his employment-related absences that made the circumstances exceptional. The circuit court echoed this position, stating, "In the past whenever Mr. McDermott faced adverse circumstances, he left the State for protracted periods of time for sea duty, seemingly without concern for how his leaving would affect Patrick." The circuit court was not able to find that

---

46. Being a member of the Merchant Marine is a calling; often an honorable calling requiring many sacrifices. In time of war members of the Merchant Marine sometimes make the ultimate sacrifice. Employment in the vocation is not some type of "bad act." Not only is it a job, but it is a service to be in the United States Merchant Marine.

Mr. McDermott was an unfit parent, but rather declined to grant him custody based on "exceptional circumstances" occasioned by the absences inherent in his position as a merchant mariner. Accordingly, it was Mr. McDermott's employment that persuaded the circuit court of the presence of "exceptional circumstances."

The absences inherent to Mr. McDermott's merchant marine work are not unlike those required of military personnel or others in occupations mandating periods of service away from one's home. Custody issues should be determined on a case-by-case basis. *See Barnard v. Barnard*, 157 Md. 264, 267–68, 145 A. 614, 616 (1929) stating the proposition that "[t]here can be no binding, and very little helpful, precedent found in the decisions of the courts on this subject, because essentially each case must depend upon its peculiar circumstances" (alteration added). It is noted that other courts also generally have been reluctant to establish a definitive standard governing child custody when a fit parent is called away for an extended period for work. For example, the case of *In re Marriage of Rayman*, 273 Kan. 996, 47 P.3d 413 (2002), discusses the Supreme Court of Kansas' rejection of a mother's request "for a bright line rule that a parent with residential custody of his or her children loses that custody when required to be away from his or her children for an extended period of time" such as a twelve-month military tour overseas. *Id.* at 1001, 47 P.3d at 416. *In re Rayman* involved a non-residential custodian fit mother who invoked the parental preference doctrine (*i.e.*, fit parents are a child's preferred custodians) contending that it was less disruptive to her children to place them in her temporary residential custody in Kansas and later Tennessee, than to allow them to remain with their stepmother, and near her ailing parents in Texas, while the children's residential custodian father completed a twelve-month military "hardship tour" in Korea before returning to Texas. *Id.* at 999, 47 P.3d at 416. In rejecting the mother's petition, the Kansas high court observed: "Each situation involving military families has distinct differences, as do the facts of temporary changes which relate to nonmilitary

custodial relationships. The temporary transfer of the parent with residential custody must not automatically trigger a custody change .... Custody is an issue to be determined on a case-by-case basis ...." *Id.* at 1001, 47 P.3d at 416–17.

In a somewhat analogous and presently unreported decision involving a soldier's Family Care Plan, *i.e.,* a compulsory document providing for care of the family in the soldier's absence, which provided that the paternal grandmother would care for the children during the custodian soldier-father's deployment, the Court of Appeals of Iowa, that state's intermediate appellate court, adopted the holding of the *In re Rayman* court, stating, "We further decline to adopt a bright line rule divesting a parent of physical care whenever the parent is required to be away from the children for an extended period." *In re Marriage of Grantham,* 2004 WL 2579567, at *8 (Iowa App., Nov.15, 2004). Similarly, in *In re Marriage of Hruby,* 304 Or. 500, 748 P.2d 57 (1987), a divorced legal custodian father, who had served in the Navy since the child's birth and had placed the child in the care of the child's aunt given the parents' inability to provide care, sought to regain custody of his child with whom he had maintained regular contact and support. *Id.* at 503, 748 P.2d at 58. The child's care-giver aunt disputed a parental custodial preference and intervened in the heated custody action asserting that the child had developed a close relationship with the aunt and uncle. *Id.* at 502–503, 748 P.2d at 58. In awarding custody of the six-year-old child to the father, the Oregon Supreme Court noted that Oregon law supports a fit parent's right to custody of his minor children "unless there are compelling reasons for depriving him of that custody" *Id.* at 508 n. 5, 748 P.2d at 62 n. 5 (emphasis omitted), and because the father was not a stranger to his child, there was "no showing that the child would not receive adequate care and love from the father or that the child would be otherwise unduly harmed, physically or psychologically, by giving custody to him." *Id.* at 517, 748 P.2d at 67. Thus, the *In re Hruby* court found no compelling reasons to deny custody to the father.

In non-military circumstances [47] courts have reached similar results in favor of a fit parent who is temporarily gone for extended periods and who desires custody of his or her children. The Louisiana intermediate appellate court declined to maintain custody in the maternal grandparents, who had assumed custody after their daughter abandoned her husband and minor children, when the father later sought custody of the children. Similar to the present case, the father, *a tugboat captain*, initially had consented to the grandparent custodial arrangement because he was away from home on a regular basis. *Jones v. Jones*, 415 So.2d 300, 301 (La.Ct.App. 1982). In approving of custody with the father, who had paid child support on a regular basis and had a new wife who desired to have the children and care for them, the court stated:

> "It is not proper to merely compare the parent's circumstances and situation with that of the non-parent and award custody on the basis of best interests of the child. The 'best interest' comparison is the proper basis for custody contests between parents; *it is not properly applied to a contest between a parent and a non-parent because the parent enjoys the paramount right to custody.* ... [T]he trial court did not find, and the record does not support a finding, that appellant has forfeited his right to parenthood; is unfit to care for his children; or is unable to provide a home for them. Although the [maternal grandparents] have

---

**47.** Service in the Merchant Marine can be classified as somewhere between military and non-military service. In times of war the Merchant Marine may come under governmental control. The Merchant Marine Act of 1936, 46 U.S.C. app. § 1101 (2004) provides *inter alia*, "It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine ... (b) capable of serving as a naval and military auxiliary in time of war or national emergency .... It is declared to be the policy of the United States to foster the development and encourage the maintenance of such a merchant marine."

It is not clear whether the ships upon which petitioner sailed during the relevant periods were United States flagged vessels. They may have been foreign flagged vessels. In any event, petitioner was a licensed captain in the Merchant Marine, albeit, at times he may have served as an officer or seaman on foreign flagged vessels.

cared for these children for a considerable period of time, we do not consider this to be a compelling reason to leave the children with them particularly in light of [the father's] remarriage, stable lifestyle, and close, loving relationship with his children. *Likewise, [the father's] absences from home in connection with his employment do not constitute a compelling reason to deprive him of the custody of his children.*"

*Id.* at 302 (alterations added) (emphasis added) (footnote omitted) (citations omitted).

Some may discern from these cases a theme that suggests that grandparents are convenient surrogates for parents who encounter difficulties—whether economic, emotional or logistic—in raising their children. Grandparents' contributions do not go unnoticed and their efforts likely accrue to the benefit of the grandchildren. A quote from a case before the Supreme Court of Iowa supports this proposition, but with an especially relevant caveat:

"Our cases have emphasized that parents should be encouraged in time of need to look for help in caring for their children *without risking loss of custody.* The presumption preferring parental custody is not overcome by a mere showing that such assistance was obtained. Nor is it overcome by showing that those who provided the assistance love the children and would provide them with a good home. These circumstances are not alone sufficient to overcome the preference for parental custody."

*In re Guardianship of Sams,* 256 N.W.2d 570, 573 (Iowa 1977) (emphasis added).

Although the Doughertys did not maintain Patrick in their home and raise the child from infancy, the relative regularity of their contribution as well as the positive contribution of all grandparents must be acknowledged. Nevertheless, their efforts on Patrick's behalf under the circumstances of this case cannot overcome the fundamental constitutional right of a fit parent to exercise care and custody of his child and the circuit court, clearly impressed with the grandparents' care, cannot

invoke absences occasioned by the parent's proper employ-
ment in support of placing the child with the grandparents due
to "exceptional circumstances."

## G. Counsel Fees and Costs

 Mr. McDermott filed an answer and a coun-
ter/amended complaint in June 2003 seeking attorneys' fees
and suit costs as well as addressing custody and support
issues. The circuit court did not sign an order specifically
responding to this filing, but it can be concluded that in
awarding custody to the Doughertys, the circuit court effec-
tively denied Mr. McDermott's petition for costs and fees. In
affirming the circuit court, the Court of Special Appeals
mandated that costs were to be paid by appellant (Mr. McDer-
mott). In the present appeal, Mr. McDermott renews his
petition for attorney's fees and suit costs (which said costs
would include reimbursement of the charges for preparation of
the trial's transcript). We note that Md.Code (1984, 1999
Repl.Vol., 2004 Supp.), § 12–103 of the Family Law Article
provides for the award of costs and counsel fees in some child
custody and support actions.[48] We observe that discretion in

---

48. Md.Code (1984, 1999 Repl.Vol., 2004 Supp.), § 12–103 provides:
 "(a) *In general.*—The court may award to either party the costs and
counsel fees that are just and proper under all the circumstances in
any case in which a person:
 (1) applies for a decree or modification of a decree concerning the
custody, support, or visitation of a child of the parties; or
 (2) files any form of proceeding:
 (i) to recover arrearages of child support;
 (ii) to enforce a decree of child support; or
 (iii) to enforce a decree of custody or visitation.
 (b) *Required considerations.*—Before a court may award costs and
counsel fees under this section, the court shall consider:
 (1) the financial status of each party;
 (2) the needs of each party; and
 (3) whether there was substantial justification for bringing, main-
taining, or defending the proceeding.
 (c) *Absence of substantial justification.*—Upon a finding by the
court that there was an absence of substantial justification of a party
for prosecuting or defending the proceeding, and absent a finding by
the court of good cause to the contrary, the court shall award to the
other party costs and counsel fees."

awarding counsel fees rests with the trial court and the award of counsel fees "must be based upon the statutory criteria and the facts of the case." *Jackson v. Jackson,* 272 Md. 107, 112, 321 A.2d 162, 166 (1974); *see also Turner v. Turner,* 147 Md.App. 350, 413, 809 A.2d 18, 55 (2002) (remanding, *inter alia,* the issue of counsel fees in marriage dissolution case to the circuit court to "consider the issue of attorney's fees based on accurate factual underpinnings"). Accordingly, the trial court must determine the issue of counsel fees upon remand.

 Mr. McDermott's request for an award of the cost of the trial transcripts is a related, though less frequently examined issue, and must be addressed in the context of suit costs. Md. Rule 2–603, in regard to costs pursuant to judgment in civil actions, provides:

"(a) **Allowance and allocation.** Unless otherwise provided by rule, law, or order of court, the prevailing party is entitled to costs. The court, by order, may allocate costs among the parties."

Additionally, Title 8 of the Maryland Rules, governing "Appellate Review in the Court of Appeals and Court of Special Appeals" specifically addresses the issue of transcript preparation and transcript costs. Md. Rule 8–411 provides:

"(a) **Ordering of transcript.** Unless a copy of the transcript is already on file, the appellant shall order in writing from the court stenographer a transcript containing:

(1) a transcription of (A) all the testimony or (B) that part of the testimony that the parties agree, by written stipulation filed with the clerk of the lower court, is necessary for the appeal or (C) that part of the testimony ordered by the Court pursuant to Rule 8–206(d) or directed by the lower court in an order; and

(2) a transcription of any proceeding relevant to the appeal that was recorded pursuant to Rule 16–404 e.

(b) **Time for ordering.** The appellant shall order the transcript within ten days after:

(1) the date of an order entered pursuant to Rule 8–206(a)(1) that the appeal proceed without a prehearing

conference, or an order entered pursuant to Rule 8–206(d) following a prehearing conference, unless a different time is fixed by that order, in all civil actions specified in Rule 8–205(a), or

(2) the date the first notice of appeal is filed in all other actions.

(c) **Filing and service.** The appellant shall (1) file a copy of the written order to the stenographer with the clerk of the lower court for inclusion in the record, (2) cause the original transcript to be filed promptly by the court reporter with the clerk of the lower court for inclusion in the record, and (3) promptly serve a copy on the appellee."

Md. Rule 8–607(a), governing assessment of costs provides, in part:

"(a) **Allowance and allocation.** Unless the Court orders otherwise, the prevailing party is entitled to costs. The Court, by order, may allocate costs among the parties."

Md. Rule 8–608, addresses the computation of costs:

"(a) **Costs generally allowed.** The Clerk shall include in the costs the allowance determined pursuant to section (c) of this Rule for reproducing the briefs, the record extract, and any necessary appendices to briefs and any other costs prescribed by these rules or other law. Unless the case is in the Court of Appeals and was previously heard and decided by the Court of Special Appeals, the Clerk shall also include the amount paid by or on behalf of the appellant for the original and the copies of the stenographic transcript of testimony furnished pursuant to section (a) of Rule 8–411. If the transcript was paid for by the Office of the Public Defender, the Clerk shall so state.

(b) **Costs generally excluded.** Unless the Court orders otherwise, the Clerk shall exclude from the costs the costs of reproducing the record if it was reproduced without order of the Court.

(c) **Allowance for reproduction.** The Clerk shall determine the allowance for reproduction by multiplying the number of pages in the briefs, the record extract, and any

necessary appendices to briefs by the standard page rate established from time to time by the Court of Appeals."

Accordingly, based on the fact that Mr. McDermott sought a transcript of the circuit court proceedings in order to prosecute his appeal, the costs incurred in obtaining that transcript are considered "costs" of his suit.

## III. Conclusion

In this case there is no doubt that Patrick loves his father and Mr. McDermott loves his son. Petitioner has maintained his relationship with his son since the child's birth, even when the child was not domiciled with him. The results of myriad examinations, reports and testimony were insufficient to convince the circuit court that Mr. McDermott was an unfit parent, and clearly, Mr. McDermott's vigorous use of the family courts provides insight on his desire to have custody of Patrick. Courts cannot preempt the established and constitutionally-protected fundamental rights of a parent, who is not "unfit," simply because that parent's job takes him from the State for extended periods of time or merely because a child might be better off, in a particular judge's view, living elsewhere. The circuit court erred in invoking the dictates of Mr. McDermott's work as a merchant marine, insofar as the requirements of the job caused him to be absent from the state for several months-long periods of time, and arriving at the conclusion that application of the guidelines for "exceptional circumstances" warranted placing Patrick in the custody of his maternal grandparents.

We reverse the judgment of the Court of Special Appeals and remand to that court with instructions to reverse the decision of the circuit court. The case is ordered remanded to the circuit court in order for it to address the issue of counsel fees. All costs to be paid by respondents.[49]

---

49. The concurring opinion implies that the majority opinion is in conflict with seven of our prior cases: *Nagle v. Hooks, Taylor v. Taylor, McCready v. McCready, Petrini v. Petrini, Boswell v. Boswell, In re Mark M.* and *Shurupoff v. Vockroth.* Other than *Shurupoff,* the present

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AND TO REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.

WILNER, J. concurs.

Concurring Opinion by WILNER, J.

I concur in the judgment because it is clear to me that, under the standards that this Court has consistently applied since *Ross v. Hoffman,* 280 Md. 172, 372 A.2d 582 (1977), the

opinion is not inconsistent with any of the seven cases. *Shurupoff* is a case that modified the holding in *Ross v. Hoffman* and is a case we partly disavow in the case *sub judice.* *In re Mark M.* involved a dispute between the State and a parent and was a case in which a child in a previous case had been adjudged a Child in Need of Assistance and who had already been placed in a guardianship. The issue in that case concerned whether the juvenile court had improperly delegated its authority to establish visitation to the Department of Social Services and also issues of psychological evaluations, including independent evaluations, to be used in determining visitations.

The other cases are even more distinguishable. None involve third-party attempts to gain custody over the children of others. The majority opinion is clearly limited to such third-party cases. *Nagle, Taylor, McCready, Petrini,* and *Boswell* are all cases involving disputes between natural parents. The present opinion changes nothing as to those cases, does not apply to *In re Mark,* and overrules, in part, *Shurupoff,* which itself overruled a relevant part of *Ross v. Hoffman.* It was *Shurupoff* that departed from the principles of *Ross v. Hoffman.* The majority opinion in the case at bar, restores it and further clarifies *Ross v. Hoffman.*

We have been careful not to resolve issues relating to the rights and responsibilities of the State in the various actions in which it plays a role, leaving those issues for the cases in which they are presented. Moreover, we have time and again in our opinion noted that the "best interest" standard that applies in disputes between natural parents, with our opinion, remains unchanged.

The Court has gone to great lengths to affirm that the present opinion is limited to the context of attempts by pure third parties to gain custody over the children of others.

trial court erred in granting custody of Patrick to the Doughertys. I do not concur, however, with the Court's sudden and wholly unnecessary *purported* discarding of those standards. I say "purported" because it is not clear to me what the Court has really done in its 113–page slip opinion, other than to sow uncertainty and confusion in an area that demands clear and accessible guidelines.

In *Ross, supra,* this Court, synthesizing earlier decisions, laid out a very clear standard for resolving custody disputes between a parent and a non-parent. We said:

"To recapitulate: the best interest of the child standard is *always* determinative in child custody disputes. When the dispute is between a biological parent and a third party, it is presumed that the child's best interest is subserved by custody in the parent. That presumption is overcome and such custody will be denied if (a) the parent is unfit to have custody, or (b) if there are such exceptional circumstances as [to] make such custody detrimental to the best interest of the child."

*Id.* at 178–79, 372 A.2d at 587. (Emphasis added).

We recognized in *Ross* that parents "have the natural right to the custody of their children," *id.* at 176, 372 A.2d at 586, but regarded the strong presumption in favor of such custody as sufficient to protect that right. We made clear that "the ordinary entitlement of parents to the custody of their minor children" was not absolute and that it "would not be enforced inexorably, contrary to the best interest of the child, on the theory of an absolute legal right." *Id.* at 176, 178, 372 A.2d at 586–87.

At least seven times since *Ross* we have restated and confirmed those principles. In *Nagle v. Hooks,* 296 Md. 123, 128, 460 A.2d 49, 51 (1983), citing *Ross, supra,* 280 Md. at 174–75, 372 A.2d at 585, we stated that "[i]n resolving custody disputes, we are 'governed by what is in the best interest of the particular child and most conducive to his welfare. This best interest standard *is firmly entrenched in Maryland and is deemed to be of transcendent importance.*'" (Emphasis

added). In *Taylor v. Taylor,* 306 Md. 290, 303, 508 A.2d 964, 970 (1986), we made the point:

"We emphasize that in *any* custody case, the paramount concern is the best interest of the child. As Judge Orth pointed out for the Court in *Ross v. Hoffman* [citation omitted], we have variously characterized this standard as being 'of transcendent importance' and the 'sole question.' The best interest of the child is therefore not considered as one of many factors, but as the objective to which virtually all other factors speak."

(Emphasis added).

In *McCready v. McCready,* 323 Md. 476, 481, 593 A.2d 1128, 1130 (1991), we repeated that statement from *Taylor.* In *Petrini v. Petrini,* 336 Md. 453, 468, 648 A.2d 1016, 1023 (1994), citing *Ross, supra,* 280 Md. at 174–75, 372 A.2d at 585, we observed that "[c]hild custody awards have traditionally been predicated on the 'best interest' of the child involved." In *Boswell v. Boswell,* 352 Md. 204, 219, 721 A.2d 662, 669 (1998), citing *Taylor, supra,* 306 Md. at 303, 508 A.2d at 970 (quoting in part from *Ross, supra,* 280 Md. at 175 n. 1, 372 A.2d at 585 n. 1), we stated:

"In Maryland, the State's interest in disputes over visitation, custody, and adoption is to protect the 'best interests of the child' who is the subject matter of the controversy [citation omitted]. We have described the best interests of the child standard as being 'of transcendent importance' and the 'sole question' in familial disputes; indeed, it is 'therefore not considered as one of many factors, but as the objective to which virtually all other factors speak.' "

*See also In re Mark M.,* 365 Md. 687, 705, 782 A.2d 332, 343 (2001).

Only two years ago, in *Shurupoff v. Vockroth,* 372 Md. 639, 814 A.2d 543 (2003), we revisited afresh the standard to be applied in custody disputes between a parent and non-parent. After surveying both the consistent holdings of this Court and the treatment of the issue in other States, we consciously and clearly confirmed what we said and held in *Ross:* "The court

must always, necessarily, inquire into what is in the child's best interest, *for that is the ultimate, determinative factor."* *Shurupoff,* 372 Md. at 662, 814 A.2d at 557. (Emphasis added). We added, so that there could be no confusion:

> "The real point made in *Ross v. Hoffman* and carried forth since is that, when the dispute is between a parent and a third party, it is presumed that the child's best interest lies with parental custody. If there is a sufficient showing that the parent is unfit, however, or that exceptional circumstances exist which would make parental custody detrimental to the child's best interest, the presumption is rebutted and custody should not be given to the parent, for, in either situation, parental custody could not possibly be in the child's best interest. So long as the best interest of the child remains the definitive standard and there is any reasonable alternative, it defies both logic and common sense to place a child in the custody of anyone, including a parent, when either that person is unfit to have custody or such action, because of exceptional circumstances, would be detrimental to the child's best interest."

*Shurupoff,* 372 Md. at 662, 814 A.2d at 557.

The Court today, in a 113–page slip opinion suggests, with its right hand, that the best interest of the child standard no longer applies in disputes between a parent and a non-parent—that the parent's Constitutional right to custody is predominant—but, with its left hand, seems to indicate that that is not the case at all, and that, in the end, courts must act in the child's best interest. Why the Court chooses to take such an unnecessarily convoluted path is a mystery to me.

The Court seems to be concerned that an unfettered application of the best interest standard will result in judges engaging in inappropriate social engineering, of wrenching children from parents who may be poor or otherwise disadvantaged and giving them to wealthier, more advantaged, people on the theory that the children would be better off. That is *not* what the *Ross* approach allows, however, and the trial judges in this State understand that is not the case. The presumption afforded under *Ross* is rebutted *only* when the

evidence shows that the parent is *unfit* to have custody or that *exceptional circumstances exist which would make parental custody detrimental to the child's best interest.* Neither of those circumstances would include a feeling by a judge that the child might simply be "better off" with the non-parent, that, in the judge's view, the non-parent could give the child a more affluent or even a more caring upbringing. That does *not* suffice to warrant denying custody to the parent, and, if the record in any case indicates that the trial court did not properly apply the presumption favoring parental custody, its decision will be reversed on appeal, as this very case illustrates.

In the end, even under the Court's new approach, the trial court will have to apply the best interest standard. The Court agrees that a parent's Constitutional right to raise his/her children is not absolute. It agrees that custody may be denied to a parent if the evidence shows that the parent is unfit, and it even continues to bless the alternative basis for denying parental custody—exceptional circumstances *which would made parental custody detrimental to the child's best interest.* That will necessarily require the court to examine and be governed by what is in the child's best interest. So why go through 113 pages of convolution to say, in the end, what has already been said, confirmed, and reconfirmed in a few clear simple paragraphs?